Argued and submitted August 24, 2000, affirmed July 17, 2002

### STATE OF OREGON,
acting by and through its
### DIVISION OF STATE LANDS
and State Land Board,
*Respondent,*

*v.*

### Bruce NORRIS
and Veronica P. Norris,
*Appellants.*

### 97-2093; A107393

50 P3d 595

Paul Eberhardt argued the cause for appellants. With him on the opening brief was Smith, Freed, Heald & Chock, P.C.

With him on the reply brief was Smith, Freed, Chock & Eberhard, P.C.

Jas. Jeffrey Adams, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Warren, Senior Judge.

DEITS, C. J.

**DEITS, C. J.**

Defendants, Bruce and Veronica Norris, appeal from the trial court's judgment granting plaintiff's[1] request for injunctive and declaratory relief concerning defendants' use of submerged and submersible lands[2] of the Columbia River. We review *de novo*, ORS 19.415(3), and affirm.

Defendants own property in Rainer, Oregon, that fronts the Columbia River. As a general matter, the state has title "to the submersible and submerged lands of all navigable streams and lakes in this state now existing or which may have been in existence in 1859 when the state was admitted to the Union, or at any time since admission, and which has not become vested in any person * * *." ORS 274.025(1). On appeal, defendants do not dispute that the state owns the submerged land in that portion of the river adjacent to defendants' property. Apparently, defendants own the property to the ordinary low-water line. Defendants, or their predecessors in interest, have erected various structures that project over the submerged and submersible lands. Those structures are presently being used for semi-permanent or permanent moorage for vessels and equipment and for storage of salvage materials and scrap metal. Defendant Bruce Norris was contacted in 1995 by DSL and was told that a lease was required for defendants' uses of the property pursuant to ORS 274.915. Defendants took the position that they were not required to execute a lease for their use of this land.

In 1997, DSL filed a complaint against defendants, alleging that they or their predecessors caused docks, piers, and other permanent structures to be constructed on property belonging to the state. The complaint alleges that the structures have been used as semi-permanent or permanent moorages for boats, for storage of salvage materials, and for

---

[1] Plaintiff in this case is the State of Oregon, acting by and through its Division of State Lands and State Land Board. We will refer to plaintiff throughout the opinion as the state or DSL.

[2] "Submerged lands" are lands that lie below the ordinary low-water mark of navigable waters. ORS 274.005(7); *Brusco Towboat v. State Land Bd.*, 284 Or 627, 630 n 3, 589 P2d 712 (1978). "Submersible lands" lie between the ordinary high-water mark and the ordinary low-water mark of navigable waters. ORS 274.005(8); *Brusco Towboat*, 284 Or at 630 n 3.

commercial and residential purposes and also alleges that defendants have continued to use the property for those purposes despite repeated requests to either vacate the state lands or to obtain a lease from DSL. The complaint also alleges that defendants presently could not have obtained a lease for their use of the property because, under the existing circumstances, the structures "do not comply with applicable state statutes and administrative rules, and are not in compliance with federal and local standards, laws, and regulations which are applicable to them."

DSL's first claim for relief was labeled as one for "ejectment." In that claim, DSL requested a judgment ordering defendants to remove all structures and other property from the state's property. The second claim was labeled as one for "injunctive relief for nuisance." In that claim, DSL alleged that defendants' activities constituted an "unreasonable interference with public health and safety and a nuisance" and asserted entitlement to a mandatory injunction requiring defendants to remove all materials that overlie the state's property and to "remove so much of that material overlying [d]efendants' own submersible property which is a nuisance." DSL's third claim for relief was labeled as one for declaratory relief. DSL requested declarations regarding whether defendants were entitled to obtain a lease to continue to use the property and regarding the proper location of the boundary line between the state's and defendants' property. In sum, DSL prayed for the following relief:

"1) Requiring [d]efendants to immediately remove all structures which encroach upon or overlie the submerged or submersible property owned by the State of Oregon.

"2) Requiring [d]efendants to immediately remove all materials and structures which constitute a nuisance.

"3) Entering a declaratory judgment as set forth above."

Following trial, the court entered an order declaring the ordinary low-water line to be the permanent boundary between the state's and defendants' property and declaring that the location of the line is as described in a survey documented in Exhibit 61. The court also declared that the structure in question is not a "wharf" that is authorized by ORS

780.040 and reasoned that the structure and other stored items interfere with the public's use of the state's property. The court ordered that defendants remove all of their property except the Norris structure from the state's property within 90 days from the date of the judgment. Additionally, the court ordered defendants to remove all of the Norris structure that is located on the state's property within 180 days from the date of the judgment. It also ordered that defendants (or any other person or entity under defendants' control) not place or maintain any permanent structure or items of personal property on any state property anywhere in the state for longer than 14 days without prior written approval from the state. The order also required that the state's representatives be given access to the state's property through defendants' property in order to monitor and determine compliance with the court's order. Defendants appeal from the resulting judgment.

■    Defendants first assign error to the trial court's denial of their request for a jury trial. Defendants argue that, because DSL labeled its first claim as one for ejectment, which is a legal claim, they were entitled to a jury trial. DSL takes the position that it took at trial, that all of the relief sought and obtained was "essentially equitable" and that there is no right to a jury trial in equitable proceedings. The trial court denied defendants' request, stating that there was no basis for a jury trial "and that the primary issue to be decided in this case is the location of the low[-]water line of the Columbia River * * *." The court reserved the right to call an "advisory jury" should a factual issue arise that would require a jury finding. However, a jury was not called.

■    Defendants are correct that a claim of ejectment states a claim at law. *Corvallis Sand & Gravel v. Land Board*, 250 Or 319, 324, 439 P2d 575 (1968). It is also true, however, that the label given to a claim does not determine whether the matter is at law or in equity. *Lieuallen v. Heidenrich*, 259 Or 333, 334-35, 485 P2d 1230 (1971). The critical inquiry in deciding if a matter is one at law or in equity is the relief sought. As explained by the Oregon Supreme Court:

"Whether a lawsuit is at law or in equity is sometimes a perplexing problem. The usual basis for distinction is the nature of the relief sought. With limited exceptions, a suit for an injunction is in equity because only equity gives injunctive relief. The statute limits equitable relief to 'cases where there is not a plain, adequate and complete remedy at law,' or 'where courts of equity have been used to exercise concurrent jurisdiction with courts of law.' ORS 11.020." *Carey v. Hays*, 243 Or 73, 77, 409 P2d 899 (1966) (footnote omitted); *see also May v. Chicago Insurance Co.*, 260 Or 285, 291-92, 490 P2d 150 (1971) (reasoning that declaratory judgment proceedings will be treated as legal or equitable depending on their nature).

More recently, in *McIntyre v. Photinos*, 175 Or App 478, 28 P3d 1259 (2001), we reiterated the principle that the nature of the relief sought is the critical factor in deciding if a matter is one at law or in equity. In that case, neighboring landowners were involved in a dispute regarding the ownership of a strip of land. The plaintiff brought an action in ejectment and also asked for a declaration of her ownership, claiming that she had acquired title through adverse possession. The trial court did not issue a judgment of ejectment but declared that the plaintiff was entitled to ownership of the property. We held that, although the plaintiff had sought both equitable and legal relief, the judgment on appeal concerned an equitable matter.

DSL argues that the relief sought and awarded in this case is essentially equitable in nature. DSL first asserts that, notwithstanding the label of its first claim for relief as an ejectment action, its request for a declaration of the boundary line between its and defendants' land is based on "purpresture," an alleged encroachment on public rights by appropriation to private use, for which an equitable remedy is appropriate. In *State Land Board v. Sause et al*, 217 Or 52, 73-74, 342 P2d 803 (1959), the Supreme Court quoted the following statement from John M. Gould, *Law of Waters* ch 1, § 21, 45-46 (3d ed 1900):

" 'Any encroachment upon the king, either upon part of the demesne lands, or in public rivers, harbors, or highways, is called a purpresture. If a littoral proprietor, without grant or license from the Crown, extends a wharf or building into the water in front of his land it is a purpresture, though the

public rights of navigation and fishery may not be impaired. * * * The remedy for a purpresture is either by an information of intrusion at common law, or by information in equity at suit of the attorney general.' " (Omission in original.)

Additionally, in *City of Eugene v. Garrett*, 87 Or 435, 444-45, 169 P 649, 170 P 731 (1918), the defendants argued that the suit was not equitable in nature. In rejecting that argument, the court said:

"In legal effect the encroachments upon the street in question, or trespass upon the easement, constitute a purpresture or public nuisance. One of the earliest recognized forms of public nuisance with which equity has interfered is that of purpresture. The jurisdiction of equity in cases of purpresture, as well as of public nuisances, generally rests in the necessity of preventing mischief and avoiding vexatious litigation. This remedy is more efficacious than that at law: 1 High on Injunctions (4 ed.), § 759. We therefore feel safe in holding that equitable jurisdiction in this case is founded upon solid grounds." *Id.* at 445.

We agree with DSL that the relief sought here was equitable in nature. Although a declaration regarding ownership of the property on which defendants maintained structures and equipment would be a necessary part of a legal determination of the ejectment claim, it is also a necessary part of a resolution of DSL's claim of nuisance and its requests for injunctive and declaratory relief. A determination of ownership is also a necessary element of resolution of a claim of purpresture. All of the relief sought here is equitable in nature and can be completely resolved in equitable proceedings. The fact that at least a portion of DSL's claims could have been resolved in an ejectment action does not make a difference here because the court was able to fully resolve all of the matters before it by granting equitable relief.

■ A request for an injunction to eliminate a nuisance and prohibit its recurrence also is in equity. In *Mugler v. Kansas*, 123 US 623, 673, 8 S Ct 273, 31 L Ed 205 (1887), the Court stated:

"The ground of this jurisdiction in cases of purpresture, as well as of public nuisances, is the ability of courts of equity to give a more speedy, effectual, and permanent remedy,

than can be had at law. They can not only prevent nuisances that are threatened, and before irreparable mischief ensues, but arrest or abate those in progress, and, by perpetual injunction, protect the public against them in the future; whereas courts of law can only reach existing nuisances, leaving future acts to be the subject of new prosecutions or proceedings. This is a salutary jurisdiction, especially where a nuisance affects the health, morals, or safety of the community."

*See Gaston, Town of, v. Thompson*, 89 Or 412, 422, 174 P 717 (1918) (citing *Mugler*).

We would also note that DSL's complaint was not limited to a request that presently existing structures be removed. DSL also asked for "other relief as the [c]ourt deems just and equitable." Although somewhat vaguely stated, this request is common in prayers for equitable relief and was the apparent basis for the court's grant of an injunction against further occupation of state land. The remedy requested in this case was complete in the sense that it sought to eliminate the existing occupation of state property and that it sought to prohibit future occupations. Resolution of the ejectment claim would not have provided such complete relief. In sum, we conclude that plaintiff sought equitable relief. Accordingly, we find no error in the trial court's conclusion that defendants were not entitled to a jury trial.

■　Defendants' second assignment of error is that the trial court erred in concluding that ORS 780.040 did not authorize defendants' structure. ORS 780.040 provides:

"(1)　The owner of any land lying upon any navigable stream or other like water, and within the corporate limits of any incorporated town or within the boundaries of any port, may construct a wharf upon the same, and extend the wharf into the stream or other like water beyond low-water mark so far as may be necessary for the use and accommodation of any ships, boats or vessels engaged exclusively in the receipt and discharge of goods or merchandise or in the performance of governmental functions upon the stream or other like water.

"(2)　As used in this section, 'wharf' does not include new lands created upon submersible or submerged lands by artificial fill or deposit."

The trial court concluded that defendants' structure was not a wharf, as the term is used in the statute, because it was not being used to accommodate vessels engaged in the receipt and discharge of goods or merchandise. Rather, the structure was being used for other private purposes, principally for a salvage operation. Defendants argue that the trial court erred in its reading of ORS 780.040. On appeal, they do not appear to dispute that the structure is not presently being *used* to accommodate vessels engaged exclusively in the receipt and discharge of goods or merchandise. In their view, however, the use of the structure is not determinative. Defendants argue that, in order to come within the authorization of ORS 780.040 to build a wharf, the structure need only have been *constructed* for use in such activities. In other words, in defendants' view, so long as the structure was constructed for the purpose of being used by vessels engaged exclusively in the receipt and discharge of goods or merchandise, or in the performance of governmental functions, its present use does not matter. Defendants also argue that the trial court erred in concluding that, in order to qualify as a wharf under ORS 780.040, the wharf must be available for public commerce.

◼︎　　In urging its construction of ORS 780.040, defendants overlook the plain language of the statute. *See PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-11, 859 P2d 1143 (1993). ORS 780.040(1) provides, in part, that a wharf may be extended "into the stream or other like water beyond low-water mark *so far as may be necessary for the use and accommodation of any ships, boats or vessels engaged exclusively in the receipt and discharge of goods or merchandise.*" (Emphasis added.) That language makes it clear that the privilege to extend a wharf over public lands without obtaining a lease is premised upon the use being necessary to accommodate vessels actually engaged exclusively in the on-loading and off-loading of goods or merchandise. If the structure is not necessary for that purpose or if it, though once necessary, becomes unnecessary, the structure is no longer a "wharf" under the terms of the statute.

◼︎　　Defendants' third assignment of error is that, "[e]ven if the [c]ircuit [c]ourt had been correct in holding that [defendants'] current use of the [w]harf put them outside ORS

780.040, it erred in denying [defendants] an opportunity to conform to the statute." DSL responds, *inter alia*, that defendants did not present evidence that their use of the structure was being changed from one of marine salvage, ship repair, and long-term moorage to the receipt and discharge of goods or that they had any plans to do so. In any event, defendants do not cite, nor are we aware of, any authority requiring a trial court to allow a person violating a statute to cure the violation. Defendants have the alternatives of negotiating a lease with DSL or demonstrating their compliance with ORS 780.040.

■    Defendants' fourth assignment of error is that the trial court erred in fixing the ordinary low-water line. The court determined the ordinary low-water line based on a survey prepared for the state and admitted into evidence as Exhibit 61. Defendants, however, failed to present any specific evidence as to the correct location of the ordinary low-water mark. Their objection to the survey was that the survey was wrong because the boundary is constantly changing due to accretion and avulsion and, therefore, fixing it at the location identified in the survey was error. DSL acknowledges that boundaries may change. *See Morse Bros., Inc. v. Wallace*, 78 Or App 138, 140 n 2, 714 P2d 1095, *rev den* 301 Or 165 (1986). That possibility does not mean, however, that the boundary may not be fixed at any given time and treated as permanent until shown to have changed as a result of gradual accretion. *See Wilt v. Endicott*, 68 Or App 481, 487, 684 P2d 595, *rev den* 297 Or 824 (1984) (discussing the general rule that, "[b]ecause beds and shores of bodies of water are subject to movement, * * * when such changes are gradual, the boundary will follow the water rather than remain where it was on the ground at the time of the original conveyance").

Defendants did not offer an alternative survey or other evidence establishing the boundary at some other time or otherwise offer a specific line that they believe more correctly establishes the boundary.[3] Instead, as discussed above,

---

[3] Defendants do not challenge the contour line of 1.58 feet above NGVD (National Geodetic Vertical Data) setting the ordinary low-water line, established in the survey. Testimony by Stephen Purchase of DSL showed that the ordinary low-water line signifies the average location of the waterline over time. He

they simply argue that, because the river level changes, a permanent boundary cannot be set. As the trial court stated, that theory would never allow DSL to determine its owner-ship. "Under [d]efendant[s'] theory, there essentially would be an ever-changing boundary between the [d]efendants' property and the [p]laintiff's property. One of the fundamental theories behind the law is that there should be certainty and there should be conclusions to disputes." Defendants present no convincing evidence or argument to support their view that the boundary should be regarded as in constant flux, and we find no error in the trial court's disposition.

■ Defendants' final assignment of error is that the trial court's order went beyond what was necessary to address actual or threatened injury in that it prohibited them from placing or maintaining "any permanent structure or items of personal property on any of [p]laintiff's land anywhere in the State of Oregon for a period longer than fourteen (14) days without prior written approval from the [p]laintiff." They cite *Marsh v. Walters*, 242 Or 210, 216, 408 P2d 929 (1965), for the proposition that an act not threatening further or irreparable damage will not ordinarily support an injunction against its repetition. Defendants express concern that the order makes them

> "second class citizens in parks and highways and other public property throughout the state. As to submerged lands and ships particularly, this order adversely affects the [defendants'] substantive rights to, for example, moor their vessels in areas that the [DSL] has leased to third parties by agreement with those third parties."

DSL responds that defendants did not raise those concerns before the trial court and, therefore, those issues should not be considered here. We agree. Although the trial court's prohibition is broad, defendants had an opportunity to and did file objections to the trial court's memorandum and order. They did not object to that portion of the order or seek

---

indicated that the line might fluctuate on any given day, but it is the level to which the water rises and falls ordinarily, as opposed to exceptionally. We presume that defendants rely on this fluctuation to support their assertion that the boundary as fixed by the court is necessarily incorrect. That fluctuation, however, hardly supports the argument that the boundary may not be set as stated in a competent survey.

clarification. Their failure to do so precludes our addressing the issue on review. ORAP 5.45; *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 380, 823 P2d 956 (1991); *Shields v. Campbell*, 277 Or 71, 77-78, 559 P2d 1275 (1977).

Affirmed.