Argued and submitted December 20, 2004, affirmed May 11, 2005

NORTHWEST STEELHEADERS ASSOCIATION, INC.,
an Oregon nonprofit corporation;
Raymond D. Dezellem;
and Richard "Rick" Allen,
*Respondents,*

*v.*

David SIMANTEL,
Tammy Simantel,
and William Wyatt, et al,
*Defendants,*

*and*

David SCHLECHT,
Sarah Schlecht,
and Miani, Williamson & Evans,
*Appellants,*

*and*

STATE OF OREGON,
by and through the Oregon State Land Board,
*Respondent,*

*and*

Robert Jon GROVER,
*Intervenor-Appellant.*

99C12309; A118737

112 P3d 383

Gordon R. Hanna argued the cause and filed the briefs for appellants.

Michael T. Garone, argued the cause and filed the briefs for intervenor-appellant. With him on the briefs were David F. Bartz, Jr., Carson D. Bowler, and Schwabe, Williamson & Wyatt, P.C.

Melissa Powers argued the cause and filed the brief for respondents Northwest Steelheaders Association, Inc., Raymond D. Dezellem, and Richard "Rick" Allen.

Denise Fjordbeck, Assistant Attorney General, argued the cause for respondent State of Oregon. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Haselton, Presiding Judge, and Ortega, Judge, and Deits, Judge pro tempore.

HASELTON, P. J.

## HASELTON, P. J.

Defendants[1] and intervenor appeal from a judgment that (1) declares that title to certain lands lying below the ordinary high water mark of the John Day River is held by the State of Oregon; and (2) rejects defendants' counterclaims for trespass. Defendants assign error to the denial of their motions to dismiss and for directed verdicts and to the trial court's determination that the segments of the river at issue are navigable under federal law for purposes of establishing title. Intervenor assigns error, *inter alia*, to the trial court's declaration of navigability. On the merits of the navigability question, we agree with the trial court that the segments of the John Day River at issue here were navigable at the time of statehood and, therefore, title to those segments passed to the State of Oregon at statehood. We also reject defendants' and intervenor's other assignments of error, as more fully discussed below. Accordingly, we affirm.

As discussed below, 199 Or App at 487-89, 491-93, the parties dispute the evidence, and the significance of evidence, regarding the historical use of the John Day River. However, the following facts are undisputed: The John Day River cuts a 280-mile path through the northern plateau of central Oregon. The John Day is the longest river in Oregon that runs entirely within the state, and it drains the fourth largest watershed in the state. The river's mean annual flow for the period of record is 1,959 cubic feet per second ("cfs"), as measured at Service Creek, approximately 20 River Miles upriver from the most upriver segment at issue here. Stream flows are generally highest in April, averaging over 5,000 cfs,

---

[1] Defendants include David and Tammy Simantel, David and Sarah Schlecht, and Miani, Williamson & Evans (hereafter "the Miani defendants")—all of whom own property along the John Day River—and, nominally, the State of Oregon. Robert Grover, who owns riverside property along the John Day in Gilliam and Sherman counties, intervened on the side of defendants, opposing the declaration of navigability and advocating in favor of the Simantel and Miani defendants' trespass counterclaims against plaintiffs Raymond Dezellem and Richard Allen, respectively.

The Simantels have not appealed. Nor has the state, but the state has presented briefing and arguments in support of the judgment below. Because the state has not appealed, and because its interests and arguments diverge significantly from those of intervenor Grover and the other defendants, references to "defendants" in this opinion are only to the Schlechts and the Miani defendants.

and lowest in late summer, dipping to an average of 185 cfs in September, when diversions from the upper basin claim significant volumes for irrigation.[2] Such diversions, in addition to those for mining and other uses, began with the discovery of gold in the upper John Day River basin in 1862. Before that time, stream flows during some summer months were almost double their current volume.

In 1898, the United States granted a federal patent to the predecessors in interest of the Miani defendants. That patent purported to transfer title to all land within a metes and bounds description that spanned the course of the John Day River at approximately River Miles 133 to 135. In 1906, the federal government similarly conveyed title to land in the vicinity of River Miles 18 to 33 to the Simantels' predecessors in interest. The current warranty deed to the Simantel property states that it conveys certain land lying "north * * * [and] [e]ast of the John Day River." All of the deeds held by defendants today contain language subjecting their titles to the "rights of the public and of government bodies." The parties stipulated at trial that a title officer would testify that nothing in the deeds or chain of title for the Schlecht, Simantel, or Miani defendants' properties grants use, occupancy, or ownership rights to plaintiffs Dezellem or Allen, members of the public, or the State of Oregon and that, "[i]f the rights of the public and the state of Oregon arise because the John Day River was navigable in fact in 1859, that fact would not appear in the title documents."

This action—raising the question of whether, in certain locations, the bed and banks of the John Day River are privately or publicly owned—was precipitated by an incident of alleged trespass. In September 1998, plaintiff Dezellem was cited for criminal trespass while fishing from the east bank of the John Day River at approximately River Mile 21, where the Simantels' property is located[3] and across the river

---

[2] Due to the vagaries of precipitation and runoff, actual daily stream flow varies throughout the year. Statistical analysis of stream flow data over the period of record (1929-1999) indicates that the flow at Service Creek can be expected to exceed 300 cfs approximately nine months of the year.

[3] The facts pertaining to the tresspass counterclaims, which arise from two separate incidents in 1998 and 2000, are set out in greater detail below. 199 Or App at 476-78.

from the Schlechts' property. Although the criminal trespass charge was subsequently dismissed, in March 1999, Dezellem and Northwest Steelheaders filed this action seeking (1) a declaration of navigability and state ownership of the bed and banks of certain segments of the river and (2) an injunction barring defendants from excluding plaintiffs or other members of the public from using the waterway, bed, and banks of the river in those same locations.[4] The Simantels asserted a counterclaim against Dezellem, in which they alleged that he had trespassed on their property while fishing from the bank of the river.

In June 2000, plaintiff Allen was threatened with prosecution for criminal trespass by an agent of the Miani defendants, as he fished from a sandbar in the middle of the John Day at approximately River Miles 133-135, where the Miani defendants own property known as the Burnt Ranch. Thereafter, Allen joined this action as an additional plaintiff, and the Miani defendants were joined as additional defendants. For their part, the Miani defendants alleged a trespass counterclaim against Allen. Ultimately, as alleged in the operative fifth amended complaint, plaintiffs sought a declaration that "the John Day River, as it passes the real property owned by the individual defendants, is navigable."

The case was tried in February 2002. Given the nature of the claims and counterclaims, the trial court empaneled a jury in a dual capacity—first, as trier of fact on the trespass counterclaims, and second, as an advisory jury with respect to "factual issues raised by plaintiffs['] * * * claims pertaining to the navigability" of the river.[5] The jury returned a verdict that plaintiffs Dezellem and Allen were not liable for trespass, and, in its advisory capacity, the jury rendered a finding that the John Day River is navigable in fact at the disputed locations.

---

[4] Plaintiffs also sought, and received, both a declaration that the John Day River is subject to the public floatation easement under state law and an injunction ordering the State of Oregon to act on Northwest Steelheaders' request for a navigability study of the entire length of the river. No party challenges those rulings.

[5] As explained more fully below, 199 Or App at 479, the determination of "title navigability" for purposes of declaratory and injunctive relief is a matter committed to the court.

After an independent review of the evidence and arguments, the trial court issued an opinion determining that the John Day River is navigable in the disputed locations. The trial court subsequently entered judgment against the Simantels and the Miani defendants on their trespass counterclaims and declared that, as a result of its navigability determination, title to lands lying below the ordinary high water mark of the river at the relevant locations had vested in the State of Oregon at the time of statehood.

■　On appeal, the parties reiterate the arguments made to the trial court. At the outset, we address a threshold matter that pertains only to the Schlechts. Before the trial court, the Schlechts moved to dismiss all claims against them, alleging a lack of a justiciable controversy. They asserted that because they were not involved in the trespass incident that gave rise to this case, any adjudication as to them would implicate only "hypothetical questions that may never arise." The Schlechts later renewed those arguments by way of a motion for a directed verdict, arguing that any declaration would be purely advisory as to them and their property "because [there are] no facts in dispute that affect[ ] them." The trial court denied both motions. On appeal, the Schlechts assign error to those rulings.

As relevant to those assignments of error, testimony at trial established the following facts: The Schlechts and Simantels own property on opposite sides of the John Day River near McDonald's Crossing at River Mile 21 (*i.e.*, approximately 21 miles upstream from the mouth of the John Day). The Schlecht property is on the west (Sherman County) side of the river, while the Simantel property is on the east (Gilliam County) side of the river. Both properties were managed by defendant David Simantel, who lived in a house on the Schlecht property and who collected fees for access to the entire area. On September 26, 1998, plaintiff Dezellem, who had entered the area via land owned by the federal Bureau of Land Management, was fishing from the east bank of the river in the vicinity of the Simantel property and opposite the Schlecht property. David Simantel approached Dezellem and told him that the whole area was private property and that he would have to leave. When Dezellem refused to do so, Simantel contacted the local sheriff, who issued Dezellem a

citation for criminal trespass. That citation was subsequently dismissed.

On appeal, the Schlechts contend that "there is no allegation nor proof of any justiciable controversy" between any plaintiff and themselves because (1) Dezellem was excluded from the Simantels' property, not the Schlechts'; and (2) neither David nor Sarah Schlecht directed Simantel to exclude Dezellem. That is, it was Simantel, and not the Schlechts, who took action to exclude Dezellem from the Simantels' side of the river. Thus, the Schlechts contend, any declaration would be merely, and impermissibly, advisory as to them and their property.

ORS 28.110 requires that, in an action seeking declaratory judgment, all persons be joined as parties "who have or claim any interest which would be affected by the declaration." That requirement is jurisdictional. *See Stanley, Adm. v. Mueller*, 211 Or 198, 207, 315 P2d 125 (1957) (no justiciable controversy exists unless all persons who may have an interest in the outcome have been joined); *Vance v. Ford*, 187 Or App 412, 424-25, 67 P3d 412 (2003) (same).

Here, the Schlechts' asserted interest—*viz.*, ownership of the land between the ordinary high water mark on the west bank of the John Day to the midpoint of the channel— "would be affected by" the declaratory relief sought. Plaintiffs sought a declaration that the John Day is navigable "as it passes the real property owned by the individual defendants" for purposes of title navigability, confirming that the state— and not the adjacent property owners—holds title to the bed and banks at those points.

■■ Nevertheless, at oral argument, the Schlechts contended that any declaration could determine property rights only from the ordinary high water line on the Simantel (east) side of the river to the middle of the channel. But that argument misconstrues the nature of a declaration of navigability; by definition, such a declaration encompasses the entire width of a river's bed and banks, from ordinary high water mark to ordinary high water mark. *See Micelli v. Andrus*, 61 Or 78, 84, 120 P 737 (1912) ("[T]he right of a state to the beds of navigable rivers * * * extend to the lines of ordinary high water from bank to bank."). Thus, the trial court properly

denied the Schlechts' motions to dismiss and for a directed verdict.[6]

■ We turn, then, to the core of this case, the trial court's declaration of navigability for purposes of determining title to the bed and banks of the John Day River as that river passes the defendants' properties.[7] We review an appeal from a judgment declaring real property rights *de novo*. ORS 19.415(3) (2001); *Merit v. Losey*, 194 Or 89, 102-03, 240 P2d 933 (1952); *Division of State Lands v. Norris*, 182 Or App 547, 553, 50 P3d 595 (2002); *McIntyre v. Photinos*, 175 Or App 478, 482, 28 P3d 1259 (2001). On *de novo* review, we examine the record independently, although we give "great weight" to the trial court's credibility determinations and to those factual findings that turn on witness credibility. *Hanson and Hanson*, 192 Or App 422, 431, 86 P3d 94, *modified on recons*, 193 Or App 246, *rev den*, 337 Or 182 (2004); *Walker v. Roberds*, 182 Or App 121, 128, 47 P3d 911 (2002).[8]

---

[6] The Schlechts' position, if adopted, would lead to the incongruous result in this case of the state holding title to half of the river's channel, while the other half remained in private possession. That result could not be reconciled with the primary purpose of the sovereign's assertion of title to navigable waterways—protection and preservation of the public's interest in free passage. *Shively v. Bowlby*, 152 US 1, 57, 14 S Ct 548, 38 L Ed 331 (1894); *Pollard's Lessee v. Hagan*, 44 US (3 How) 212, 11 L Ed 565 (1845).

[7] As noted above, the Simantels and Schlechts each own property at approximately River Mile 21, near McDonald Crossing. The Miani defendants own property at approximately River Mile 135, also known as Burnt Ranch.

[8] Plaintiff Northwest Steelheaders urges us to view the trial court's navigability determination as a "federal question" that is "essentially factual" and, therefore, appropriately reviewed under the "clear error" standard employed by the federal courts in such cases. None of the cases cited, however, directly addresses whether that standard is applicable to title navigability determinations in state courts. *E.g.*, *Zivkovic v. Southern California Edison Co.*, 302 F3d 1080, 1088 (9th Cir 2002) (applying "clear error" review to trial court's determination of reasonableness of accommodation under Americans With Disability Act, 42 USC chapter 126); *Boone v. United States*, 944 F2d 1489, 1496 (9th Cir 1991) (applying "clear error" review to determination of scope of federal navigation servitude).

At oral argument, Northwest Steelheaders acknowledged that, as a state court, we are entitled to employ our own, rather than a federal, standard of review when deciding questions of federal law, unless doing so would necessarily lead to a different substantive outcome than would otherwise be reached in a federal court. *Accord Bush v. Paragon Property, Inc.*, 165 Or App 700, 706, 997 P2d 882 (2000) (suggesting that a state's "normal judicial procedures" are to be applied unless application of state procedures would "absolutely defeat" the purpose of the federal law).

In this case, adherence to *de novo* review has no such effect. Whether we review the evidence *de novo*, rendering our own factual findings, or defer to the trial

■     In *Land Bd. v. Corvallis Sand & Gravel Co.*, 283 Or
147, 151, 582 P2d 1352 (1978), the Oregon Supreme Court
described the history and significance of the concept of navi-
gability for purposes of determining title to certain riverbed
lands:

> "The original states, by virtue of their sovereignty, suc-
> ceeded to title held by the English crown to the beds of the
> navigable waters within their boundaries. When additional
> states were admitted to the union, they were admitted on
> an equal footing with the original states and, therefore,
> they also acquired title to the beds of their navigable waters
> except any portions which had passed into private owner-
> ship prior to statehood. While the land out of which the new
> states were formed was held by the federal government,
> that government had the power to alienate the title to the
> beds of navigable waters, but it was never the general pol-
> icy of the federal government to do so as part of its disposi-
> tion of the public lands. Therefore, a pre-statehood federal
> patent which describes the land conveyed as running to or
> bounded by a navigable body of water will be construed as
> conveying title only as far as the high water mark. The land
> below high water mark, except such portions as may have
> been conveyed by a properly authorized grant clearly
> expressing that intention, was retained by the federal gov-
> ernment in trust for the future states and passed to them
> upon admission to statehood. The federal government,
> therefore, had no power to convey it by a post-statehood
> patent."

(Footnotes omitted.) Lands lying below the ordinary high
water mark of navigable rivers are, thus, generally owned by
the state and are considered to have been so held since the
admission of that state to the Union.[9] The question of
whether a given river segment is navigable for purposes of
determining title under the "equal footing" doctrine is one of
federal law. *Id.* at 152 (citing *Barney v. Keokuk*, 94 US 324, 24
L Ed 224 (1877), and *Utah v. United States*, 403 US 9, 91 S Ct
1775, 29 L Ed 2d 279 (1971)); *see also United States v. Holt*

---

court's factual findings, the John Day River is navigable at the disputed locations
for purposes of establishing title.

    [9] That general rule is subject to exceptions, none of which is applicable here,
including valid post-statehood conveyance by the state and the application of state
laws regarding accretion, erosion, and avulsion.

*State Bank*, 270 US 49, 55-56, 46 S Ct 197, 70 L Ed 465 (1926).

In addressing that question of federal law, the United States Supreme Court has established a disjunctive test for navigability:

> "Those rivers * * * are navigable in fact when they *are used, or are susceptible of being used,* in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."

*The Daniel Ball*, 77 US (10 Wall) 557, 563, 19 L Ed 999 (1870) (italics and boldface added). The test is applied to the conditions of the river at the time of statehood. *United States v. Utah*, 283 US 64, 75, 83, 51 S Ct 438, 75 L Ed 844 (1931); *see also Alaska v. Ahtna*, 891 F2d 1401, 1404 (9th Cir 1989) ("[A]t the time of statehood, regardless of the actual use of the river, the river must have been susceptible to use as a highway for commerce.").

In *United States v. Utah*, the Court reiterated that the test for title navigability is, in fact, disjunctive: to sustain a state's claim to ownership of submerged lands, the river must have been *either* actually used for travel and trade at the time of statehood *or* susceptible to such use at the time of statehood. 283 US at 81-83. The Court explained the rationale for formulating and employing the alternative "susceptibility" standard, rather than relying exclusively on proof of actual use at the time that a state was admitted to the Union:

> "[A]s the title of a state depends upon the issue, the possibilities of growth and future profitable use are not to be ignored. [The state], with its equality of right as a state of the Union, is not to be denied title to the beds of such of its rivers as were navigable in fact at the time of the admission of the state either because the location of the rivers and the circumstances of the exploration and settlement of the country through which they flowed had made recourse to navigation a late adventure or because commercial utilization on a large scale awaits future demands. The question remains one of fact as to the capacity of the rivers in their ordinary condition to meet the needs of commerce as those may arise in connection with the growth of the population,

the multiplication of activities, and the development of natural resources. And this capacity may be shown by physical characteristics and experimentation as well as by the uses to which the streams have been put."

*Id.* at 83.

Since the first elucidation of the *The Daniel Ball* test, courts have found a variety of actual and possible uses to be sufficient to prove navigability, thus establishing a set of broadly stated standards for what may qualify as "trade and travel * * * in the customary modes." First, with respect to "actual use," it is not necessary that the historic use made of the river have been either widespread or commercially profitable. "The extent of * * * commerce is not the test." *United States v. Utah*, 283 US at 82. For example, the Court's most recent application of the *The Daniel Ball* test upheld a determination of the navigability of Utah's Great Salt Lake based on evidence that the Court described as "sufficient" but "not extensive":

"There were, for example, nine boats used from time to time to haul cattle and sheep from the mainland to one of the islands or from one of the islands to the mainland. The hauling apparently was done by the owners of the livestock, not by a carrier for the purpose of making money. Hence it is suggested that this was not the use of the lake as a navigable highway in the customary sense of the word. That is to say, the business of the boats was ranching and not carrying water-borne freight. We think that is an irrelevant detail. The lake was used as a highway and that is the gist of the federal test."

*Utah v. United States*, 403 US at 11.

With respect to the particular mode or means of travel or trade utilized, qualifying travel and trade is not limited to large-scale commercial or multiple passenger vessels of the sort typically engaged in modern commerce:

"[T]he true test of the navigability of a stream does not depend on the mode by which commerce is, or may be, conducted, nor the difficulties attending navigation. If this were so, the public would be deprived of the use of many of the large rivers of the country over which rafts of lumber of great value are constantly taken to market.

"It would be a narrow rule to hold that in this country, unless a river was capable of being navigated by steam or sail vessels, it could not be treated as a public highway."

*The Montello,* 87 US (20 Wall) 430, 441, 22 L Ed 391 (1874), *quoted with approval in United States v. Utah,* 283 US at 76. *See also United States v. Holt State Bank,* 270 US 49, 56, 46 S Ct 197, 70 L Ed 465 (1926) ("[N]avigability does not depend on the particular mode in which such use is or may be had—whether by steamboats, sailing vessels or flatboats."). The only relevant limitation is that the particular mode of transport be one that was common at the time of statehood. *United States v. Utah,* 283 US at 76. Accordingly, for example, in *Hume v. Rogue River Packing Co.,* 51 Or 237, 246, 92 P 1065 (1907), *on reh'g,* 96 P 865 (1908), the court cited use by "boats of small tonnage" as sufficient evidence to declare the Rogue River navigable up to River Mile 18.

Other courts have also recognized the relevance of the historic role of small boats to transport goods in volumes that might seem insignificant by modern standards. *See State of N.D. ex rel. Bd. of Univ., etc. v. Andrus,* 671 F2d 271, 278 (8th Cir 1982), *rev'd on other grounds sub nom Block v. North Dakota,* 461 US 273, 103 S Ct 1811, 75 L Ed 2d 840 (1983) ("[W]e must bear in mind that the issue is one of potential commercial use and hence navigability at the time of statehood, not in the present day. * * * [C]anoe travel at the time of North Dakota's statehood represented a viable means of transporting persons and goods."); *Alaska v. United States,* 754 F2d 851, 854 (9th Cir), *cert den,* 474 US 968 (1985) ("[W]e have liberally construed the phrase 'customary modes of trade and travel on water,' taking into account transportation methods in use at the time of statehood." (Citation omitted.)); *Puyallup Tribe of Indians v. Port of Tacoma,* 525 F Supp 65 (WD Wash 1981), *aff'd,* 717 F2d 1251 (9th Cir 1983), *cert den,* 465 US 1049 (1984) (declaring navigability on the basis that "Indians navigated the river with their fishing boats and canoes").

Further, the use of rivers to float timber from upstream logging operations to downstream mills, a widespread practice in the nineteenth and early twentieth centuries, may be sufficient evidence of actual use to establish navigability. *See, e.g., Oregon v. Riverfront Protection Ass'n,* 672

F2d 792, 795-96 (9th Cir 1982); *Logan v. Chas K Spaulding Logging Co.*, 100 Or 731, 190 P 349 (1920); *see also The Montello*, 87 US (20 Wall) at 441. *But see Micelli*, 61 Or at 82 (noting that "[t]he testimony fully supports the findings made by the trial court to the effect that the South Umpqua river, at the place indicated is a nontidal, unnavigable stream, though it had been used at times for floating logs and wood").

Finally, navigability based on either actual use or susceptibility to use may be established despite the presence of obstacles to free passage, such as rapids, riffles, or occasional areas of low water requiring portage, so long as the "natural navigation of the river is such that it affords a channel for useful commerce." *The Montello*, 87 US (20 Wall) at 441. "[N]avigability does not depend * * * on an absence of occasional difficulties in navigation." *Holt State Bank*, 270 US at 56. *See also United States v. Utah*, 283 US at 84, 86 (noting that conditions created by flood deposits of logs and driftwood "do[ ] not constitute a serious obstacle to navigation" and that, with respect to shifting sandbars in the river channel, "the mere fact of the presence of such sandbars causing impediments to navigation does not make a river nonnavigable").

Rather, and especially in assessing navigability under the alternative "susceptibility" test, the inquiry pertains to the "ordinary conditions" of the stream at the time of statehood. *See United States v. Utah*, 283 US at 82;[10] *The*

---

[10] In *United States v. Utah*, the Court provided some basis for evaluating whether periodic conditions of navigation-impairing low flow are extensive enough to constitute the "ordinary condition" of a river and, thus, bar a finding of navigability. In comparing the facts before it to cases in which rivers were found nonnavigable, the Court stated,

"In each of the cases to which the government refers, it was found that the use of the stream for purposes of transportation was exceptional, being practicable only in times of temporary high waters. In the present instance[,] * * * [the river's] susceptibility of use as a highway for commerce was not confined to exceptional conditions or short periods of temporary high water, but that during at least nine months of each year the river ordinarily was susceptible to such use."

283 US at 87. The Court thus distinguished the circumstances before it from those cases where use for transportation was found to be "exceptional" and "only in times of temporary high water," where "the ordinary flow of water is insufficient," or where "only for short intervals, when the rainfall is running off, are the volume and

*Montello*, 87 US (20 Wall) at 441 ("If it be capable in its natural state of being used for purposes of commerce, no matter in what mode the commerce may be conducted, it is navigable in fact."). Expert testimony regarding historic hydrology may be especially probative of a stream's "ordinary" susceptibility at the time of statehood. *See United States v. Oregon*, 295 US 1, 17-21, 55 S Ct 610, 79 L Ed 1267 (1935) (citing "[s]cientific and historical evidence in great volume" regarding the "physical condition of the bodies of water" both at present and at statehood).

■      With that background, we return to the dispositive inquiry: Was the John Day River, in its ordinary condition at the time of statehood, either actually used for trade and travel by craft commonly employed for such purposes, or susceptible to such use?

The record contains the testimony and reports of four expert witnesses. Professor Stephen Beckham, an ethnohistorian and professor of history at Lewis and Clark College, testified about historical uses and capacities for navigation of the John Day River, as based on historical, anthropologic, and archeological evidence. Professor Bo Shelby, the Director of the Natural Resources Program at Oregon State University, testified regarding the results of his study of the recreational use and flow requirements for various types of watercraft on the John Day River. Professor Peter Klingeman, a professor of civil engineering at Oregon State University, testified regarding the hydrologic characteristics of the John Day watershed, as based on his investigation and analysis of streamflow, precipitation, and runoff data over the historic period of record. Finally, Robert Ficken, a consultant and freelance historical scholar, testified about the history of navigation and transportation in the John Day area. The trial court found the testimony of Professors Beckham, Shelby, and Klingeman to be credible and helpful.[11] In addition to the

___

depth of the water such that even very small boats could be operated." *Id.* at 87 n 12 (comparing and quoting *United States v. Rio Grand Dam & Irrigation Co.*, 174 US 690, 699, 19 S Ct 770, 43 L Ed 1136 (1899), and *Oklahoma v. Texas*, 258 US 574, 587, 42 S Ct 406, 66 L Ed 771 (1922)).

[11] The trial court found that Mr. Ficken's testimony "was not credible and was not helpful." Based on our *de novo* review of the evidence, we generally concur in the trial court's assessment of the expert testimony.

data and historical records upon which those experts relied, the record also includes the testimony of lay witnesses who regularly make use of the John Day River.

We begin with susceptibility to navigation. On this record, there is compelling direct evidence of the river's capacity to carry travel and trade by means common at the time of statehood. We note, at the outset, that hydrologic data indicates that, in 1859, the river's summer flow was nearly twice what it is today. Due to irrigation withdrawals and channel degradation attributable to upstream mining operations,[12] the summer flow has been reduced by nearly half of what it was at the time of statehood.

We further note that, as described in detail in our discussion of "actual use" below, at the time of statehood, various Native American tribes in the Columbia River basin used dugout canoes, which typically drafted six to eight inches, for fishing, travel, and trade. *See* 199 Or App at 488-91.[13] Persuasive evidence at trial established that modern boats of similar draft traverse the length of the John Day River today with little difficulty. From those facts, we conclude that, in its ordinary condition in 1859, the John Day River as it passes the defendants' properties would have provided ample capacity for travel and trade by means of dugout canoes. *See The Montello*, 87 US (20 Wall) at 422 ("Vessels of any kind that can float upon the water, whether propelled by animal power, by the wind, or by the agency of steam, are, or may become, the mode by which a vast commerce can be conducted."); *Puyallup Tribe of Indians*, 525 F Supp at 72

---

[12] For example, a gold mining rush in the upper John Day River basin beginning in 1862 initially involved only placer mining but eventually involved hydraulic mining as well. Hydraulic mining diverted significant quantities of water from the river and also caused considerable amounts of gravel, mud, sand, and silt to be deposited in the stream bed. Similarly, diversions for agricultural irrigation began in 1862.

[13] For example, Professor Beckham testified as follows:

"Though the plateau is an arid environment, it is bisected by major river systems, the Columbia and the Snake, and then all those multiple tributaries, the Wenatchee, the Methow, the Okanogan, the Yakima, [the] Deschutes, the John Day, and these were streams on which native people traveled by canoe.

"They were also—their primary subsistence on the plateau was fishing, and living in an environment with water it was necessary to cross those rivers and also to access food resources."

(declaring navigability on the basis that "Indians navigated the river with their fishing boats and canoes").

A variety of post-statehood events involving actual use of the John Day further corroborate the stream's susceptibility to navigation as of 1859. *See United States v. Utah*, 283 US at 82 (citing evidence of actual navigation that occurred three decades after statehood as "relevant upon the issue of the susceptibility of the rivers to use as highways of commerce at the time Utah was admitted to the Union").

First, at least three vessels operated on or traversed the John Day in the late nineteenth century or early twentieth century. From 1889 to 1899, a pleasure boat sternwheeler, the "John Day Queen," plied a ten-mile stretch of the river above Clarno Rapids, from approximately River Mile 110 to River Mile 120, roughly ten miles downriver from the Miani defendants' property. After the turn of the century, that vessel was replaced with a newer sternwheeler, imaginatively christened the "John Day Queen II," which operated along the same stretch of river during the first decade of the last century. Further, in 1900, the Twickenham Ferry was relocated to Ferry Creek, 90 miles downstream, which required the ferry to traverse that stretch of the river, passing what is now the Miani defendants' property along the way. Again, given the mining-related degradation of the river's channel and the diversion of stream flows beginning in the 1860s, the river's capacity to carry commerce was almost certainly greater at the time of statehood than it was during the heyday of the John Day Queens and the Twickenham Ferry.

Second, there is evidence of at least one log drive on the John Day River in the 1920s, conducted by the Chee Lumber Company. In 1923, the company secured a franchise from the State of Oregon to transport timber down the John Day to a planned saw mill near the river's mouth.[14] The company intended to harvest some of the estimated two billion board feet of timber located in the upper John Day basin. Newspaper reports from 1925 describe plans to place 20 logs, each 16 feet long, in the river in the vicinity of Service Creek

---

[14] Such franchises were authorized by Oregon Laws 1917, chapter 128.

(approximately 20 miles upstream from the Miani defendants' property) and to float these logs downstream, accompanied by a boat with two men to monitor their progress. That test run apparently proved successful because the company's 1925 annual franchise report to the state reported moving 200,000 board feet of timber down river in that year. Although defendants and intervenor question the accuracy of that report, the success of the 1925 drive is persuasively corroborated by the fact that, between 1927 and 1929, the Chee Lumber Company purchased 5,440 acres of timberland in the headwaters area—an investment that it would not likely have made without some assurance of the ability to transport that timber downstream.[15] In all events, the evidence in this record regarding the 1925 log drive does not show "difficulties precluding utility," as was found in a case involving the potential for "rafting of logs or freight" on the Arkansas River. *See United States v. Brewer-Elliot Oil & Gas Co*, 249 F 609, 623 (WD Ok 1918), *aff'd*, 270 F 100 (8th Cir 1920), *aff'd*, 260 US 77 (1922).

We note again, as with the navigation of the John Day by vessels after statehood, hydrologic conditions in 1925 were almost certainly less hospitable to transport of log rafts than they would have been at statehood, due to the intervening mining-related channel degradation and irrigation withdrawals. Thus, the 1925 log drive is additional evidence that river conditions at the time of statehood were such as would have permitted commerce, *viz.*, timber transport.

We thus conclude, on *de novo* review, that, as of 1859, the segments of the John Day River at issue here were susceptible to both travel and trade by craft common to that time. Our review of the hydrologic conditions and of the evidence of post-statehood use persuades us that the John Day was indeed capable of sustaining at least three types of commerce at the time of statehood: Native American canoe-based trade, log runs, and sternwheeler traffic. Here, as in *United States v. Utah*, "conditions of exploration and settlement

---

[15] Newspaper reports from 1929 indicate that Chee Lumber Company may have attempted a second log drive at that time. However, there is no evidence whether that drive was successfully completed. Ultimately, apparently as a result of its inability to secure financing to build the mill, Chee abandoned its efforts on the John Day.

explain the infrequency or limited nature of such use." 283 US at 82; *see also Holt State Bank*, 270 US at 57 (discounting import of fact that "navigation was limited" at statehood as explained by fact that "trade and travel in that vicinity were limited").

Given the disjunctive nature of *The Daniel Ball* test, our determination that the John Day was susceptible to use for travel and trade at the time of statehood is conclusive. However, from prudential caution, we, like the trial court, elect to also address the alternative "actually used for travel and trade" criterion for title navigability. Although the evidence in this record of actual use of the John Day River in the prestatehood period is indirect and circumstantial, we find that evidence to be ultimately persuasive as to "actual use" in the lower John Day River as it passes the Schlechts' and Simantels' properties, but not as it passes the Miani defendants' property.

The lower basin of the John Day River drainage was occupied throughout the nineteenth century by Native Americans known as the Western Columbia River Sahaptin ("Western Sahaptin"),[16] sometimes referred to (inexactly) as the Tenino.[17] The Western Sahaptins were an interrelated linguistic and cultural group that ranged over a network of village communities located along the middle Columbia River and its tributaries. Specifically, their villages were located along the stretch of the Columbia River westward from present day Paterson to just upriver from The Dalles,

---

[16] The nomenclature "Western Columbia River Sahaptin" is used by historians and ethnographers to distinguish the people of the Deschutes, John Day, and Willow Creek areas from those of other Sahaptin-language speaking groups, including the peoples of the modern-day Umatilla and Walla Walla areas and the Yakama people, who occupied the area north of the Columbia River directly across from the mouth of the John Day River and who were close kin to the Sahaptin people of the John Day area.

[17] "Tenino" refers to the westernmost Sahaptin-speaking village of the Columbia River Sahaptin peoples, located just downstream from the famous Native American fishing grounds and trade center at Celilo Falls. The Celilo Falls area is located approximately 25 miles downstream from the confluence of the John Day and Columbia rivers. Before those fabled falls were flooded by construction of The Dalles Dam in 1957, native peoples from throughout the Pacific Northwest traveled to Celilo for nearly 10,000 years to fish and trade. Professor Beckham described Celilo as the "crossroads of the interior of the Pacific Northwest."

and on the lower stretches of the tributaries feeding that section of the Columbia, including the Deschutes River, the John Day River, and Willow Creek.

Sahaptins of the John Day River relied primarily on fish, particularly salmon, as their basic food source. The John Day salmon fishery was "of considerable importance" to the Western Sahaptins of the John Day basin. When salmon was not available, the indigenous people fished for steelhead in the lower John Day River, as well as for suckers, whitefish, trout, and chub.

Each riverside village was associated with an extensive area of remote and undeveloped countryside that was systematically used by extended family parties to harvest resources, such as berries, animal skins, grasses, roots, and, of course, fish. Those areas for gathering resources extended along the river drainage basins of the many tributaries feeding this section of the Columbia, ranging from as far north as the berry-gathering ground known as "Indian Heaven" southwest of Mount Adams to as far south as the present city of John Day. The Western Sahaptins' traditional gathering areas thus spanned the basins of the Deschutes and John Day rivers and upper Willow Creek, as well as much of the Columbia River corridor from The Dalles to present-day Paterson.

Western Sahaptins engaged in a substantial network of trade relations throughout this area and with groups from west of the Cascades through the Columbia Gorge and at Celilo Falls. Items of trade included roots, berries, skins, dried salmon, hemp twine (used for weaving fishing nets and root-collecting bags), obsidian (from which arrowheads were fashioned), and bear grass (for basket weaving). The Western Sahaptin trade network extended throughout the Columbia River basin and crossed linguistic and family groupings. Historians have documented Western Sahaptin use of dugout canoes on rivers throughout their traditional territory.[18]

---

[18] However, as discussed below, 199 Or App at 492, there has been no archeological corroboration of the use of dugout canoes by Western Sahaptin people on the John Day specifically.

As noted, the Western Sahaptins' traditional territory encompassed the lower John Day River drainage. A separate cultural and linguistic group, the Northern Paiute, occupied the upper John Day River drainage, upstream of the Clarno Rapids from River Mile 100 to roughly River Mile 240, and had established fishing camps and villages on the North Fork of the John Day River. As noted, 199 Or App at 486 n 13, Professor Beckham testified generally that indigenous people who lived in the Columbia River basin used canoes for travel and trade. However, he did not testify specifically as to the Northern Paiutes' use of canoes on the upper reaches of the John Day River.

There are no known eyewitness accounts of Native Americans using dugout canoes upstream from the mouth of the John Day. In 1805, as they traveled west along the Columbia River towards the Pacific Ocean, Lewis and Clark encountered a significant number of Western Sahaptins in canoes at the confluence of the Columbia and John Day rivers, but Lewis and Clark did not explore upstream. In 1811, the overland party of John Jacob Astor's Pacific Fur Company, including John Day, for whom the river is named, passed through the area but recorded no mention of canoe use on the river. In 1825 and 1831, parties of the Hudson's Bay Company also explored the John Day basin and did not record any mention of Indian use of dugout canoes on the river. Those parties did not themselves travel on the John Day by canoe; instead, they traveled overland, by foot or on horseback, northeast across the plateau to their depot at Fort Walla Walla.

The Oregon Trail crossed the John Day River very near the location of the present day Schlecht and Simantel properties; many pioneers noted the river crossing in their journals, but, again, did not mention any canoe use. Finally, immediately before statehood, between 1855 and November 1858, the United States Army barred settlement in the area in order to prevent conflict between settlers and Native Americans.

Intervenor argues that the foregoing evidence is insufficient to prove actual use of canoes on the John Day by indigenous peoples before statehood—and, indeed, that the

lack of physical or recovered historical evidence of such use disproves such use. Intervenor is correct that, while there is considerable, indeed uncontroverted, evidence that Native Americans used dugout canoes on rivers throughout the Columbia River basin, there is no direct evidence in this record of such use on the John Day River specifically. For example, there is no archeological evidence in this record establishing the presence of canoes in the John Day River channel up to 1859.

Nevertheless, that absence of direct—as opposed to circumstantial and inferential—proof is hardly dispositive. Archeological investigation in the John Day basin has been relatively limited; Professor Beckham testified to the identification of roughly a dozen sites of potential historic interest. Moreover, without some better contextual grounding in the record as to what fur trappers and pioneers typically recorded in their journals, we hesitate to ascribe much weight to the absence of references in their writings to Native American canoe use on the John Day. Thus, our assessment of actual use reduces to whether plaintiffs' circumstantial evidence of such use is persuasive, notwithstanding the absence of any direct corroboration.

On balance, we find that plaintiffs proved "actual use" in the vicinity of the of the Schlechts' and Simantels' properties, but not in the vicinity of the Miani defendants' property. With respect to the former, we note, particularly, the following colloquy between plaintiffs' attorney and Professor Beckham regarding a scholarly article on Sahaptin fishing practices in the John Day:

"Q: * * * And, in fact, this same [Sahaptin] tribe in this same article[19] fished from canoes, did it not?

"A: Yes.

"Q: All right. Is there any reason to believe that canoes were not used to fish by the [Sahaptin] at these fisheries which were documented that they participated in in the lower John Day [R]iver?

---

[19] The article referenced is Gordon Hughes, *Fishing*, in 12 Handbook of North American Indians 612, 625 (William C. Sturtevant, ed. 1998).

"* * * * *

"A:   No. There was no such reason. The fishery was central to these people's survival and fishing from canoes was an established practice throughout this entire region. And here it is referenced specifically to the [Western Sahaptin], whose homeland included the John Day."

We find that testimony ultimately persuasive. By its terms, however, it refers only to the Western Sahaptins, who, Professor Beckham testified, occupied the *lower* John Day basin, that is, downstream of River Mile 100. In context, the circumstantial evidence of actual use of the river upstream of River Mile 100, the region inhabited by the Northern Paiute, is much less comprehensive and persuasive. Accordingly, we conclude that plaintiffs failed to show "actual use" of the John Day River in 1859 at the location of the Miani defendants' property, River Miles 133-135.

In sum, we find that (1) at the time of statehood, the John Day River was susceptible to navigation as it passes defendants' properties; and (2) at the time of statehood, the John Day River was actually used for travel and trade as it passes the Schlechts' and Simantels' properties, but not as it passes the Miani defendants' properties. Accordingly, the State of Oregon held, and holds, title to the land lying below the ordinary high water mark as it passes the real property owned by the Simantels, the Schlechts, and the Miani defendants.

We reject the parties' remaining assignments of error without discussion.

Affirmed.