Argued and submitted March 7, 2014, general judgment reversed in part and remanded, supplemental judgment vacated and remanded October 14, 2015, petition for review denied February 4, 2016 (358 Or 550)

Wilbur HARDY
and Kathryn Hardy, individuals;
Idelle Collins, an individual;
Craig Tompkins, an individual;
Kirtland Farms 600, LLC,
an inactive Oregon limited liability company;
Mary Caldwell, an individual;
Chris Caldwell, an individual;
Caldwell Family, LLC,
an Oregon limited liability company;
Robert Malloy and Marilyn Malloy, individuals,
*Petitioners-Respondents,*

*and*

KIRTLAND FARMS, INC.,
*Petitioner below,*

*v.*

STATE LAND BOARD,
an agency of the State of Oregon;
and Department of State Lands,
an agency of the State of Oregon,
*Respondents-Appellants,*

*and*

ASSOCIATION OF NORTHWEST STEELHEADERS,
Rogue Riverkeeper, and
Northwest Environmental Defense Center,
*Respondents below.*

Jackson County Circuit Court
083817Z7; A148195

360 P3d 647

Inge D. Wells, Assistant Attorney General, argued the cause for appellants. With her on the brief were John R. Kroger, Attorney General, and Anna M. Joyce, Solicitor General.

Jennie L. Bricker argued the cause for respondents. With her on the brief were Beverly C. Pearman and Stoel Rives LLP.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

The State Land Board and the Department of State Lands (collectively, the state) appeal a judgment of the circuit court setting aside the board's declaration of ownership of the bed and banks of the Rogue River between river miles (RM) 68.5 and 157.5[1] under the process established in ORS 274.400 to 274.412. It also appeals a supplemental judgment awarding petitioners their attorney fees and costs.[2] The case was resolved by the circuit court on summary judgment in an other than contested case proceeding under ORS 183.484. On appeal, the state challenges the circuit court's ruling that the board's declaration of ownership did not adequately describe the nature and extent of the state's claim, as required by ORS 274.408(1)(a) and OAR 141-121-0040, and that it "claims dry land in violation of Oregon law." The state also contends that the circuit court erred in rejecting the board's determination that the river was navigable at the time of statehood between river miles 100 and 157.5—a predicate requirement for asserting state ownership to the riverbed.[3] As to the supplemental judgment, the state contends that the court abused its discretion in awarding attorney fees and costs to petitioners—because the positions taken by the board were "objectively reasonable"—and in determining that a portion of the fee award was mandatory under ORS 183.497(1)(b).

We agree with the circuit court that the board's declaration of ownership fails to satisfy the statutory requirements and, therefore, must be set aside in its entirety on that basis. For reasons of judicial efficiency, however, we also address the state's challenge to the circuit court's decision regarding the underlying navigability of RM 100 to 157.5 because, if that decision is correct—that is, if that segment of the river is not navigable—then the statutory deficiency is irremediable with respect to that segment. As explained

---

[1] The mile numbers begin at the river's mouth; thus, RM 0.0 is at the river's confluence with the Pacific Ocean. The city of Grant's Pass is near RM 100.

[2] Petitioners (respondents on appeal) are property owners along or adjacent to the portion of the Rogue River that is at issue in this case.

[3] The circuit court upheld the board's determination of navigability as to river miles 68.5 to 100. Petitioners do not cross-appeal with respect to that ruling.

below, we affirm the portion of the general judgment setting aside the declaration of ownership, but we reverse and remand the portion holding that the board's determination of navigability as to RM 100 to 157.5 "does not comply with state or federal law and is not supported by substantial evidence in the record."[4] Given that disposition, we also vacate and remand the supplemental judgment awarding petitioners attorney fees.

## I. BACKGROUND

### A. *Legal Framework*

To set this dispute in context, we begin with a brief description of the legal framework for determining state ownership of riverbeds; those principles are examined in greater detail in our analysis of the parties' arguments on appeal.

### 1. *Navigability under federal law*

Under what is known as the "equal footing" doctrine, Oregon "gain[ed] title within its borders to the beds of waters then navigable" when it became a state in 1859. *PPL Montana, LLC v. Montana*, 565 US ___, ___, 132 S Ct 1215, 1227-28, 182 L Ed 2d 77 (2012) (*PPL Montana*). And, the state is entitled to "allocate and govern those lands according to state law subject only to 'the paramount power of the United States to control such waters for purposes of navigation in interstate and foreign commerce.'" *Id.* (quoting *United States v. Oregon*, 295 US 1, 14, 55 S Ct 610, 79 L Ed 2d 1267 (1935)).[5] Thus, generally, "[l]ands lying below

---

[4] Because the issue is likely to arise on remand, we also address the state's challenge to the circuit court's conclusion that the declaration is unlawful for the additional reason that it claims dry land in violation of Oregon law. As to that point, we agree with the state that the circuit court erred.

[5] In *Land Bd. v. Corvallis Sand & Gravel*, 283 Or 147, 151, 582 P2d 1352 (1978), the Oregon Supreme Court described the doctrine as follows:

"The original states, by virtue of their sovereignty, succeeded to title held by the English crown to the beds of the navigable waters within their boundaries. When additional states were admitted to the union, they were admitted on an equal footing with the original states and, therefore, they also acquired title to the beds of their navigable waters except any portions which had passed into private ownership prior to statehood."

(Footnotes omitted.)

the ordinary high water mark of navigable rivers are \* \* \* owned by the state and are considered to have been so held since the admission of that state to the Union." *Northwest Steelheaders Association v. Simantel*, 199 Or App 471, 480, 112 P3d 383, *rev den*, 339 Or 407 (2005), *cert den*, 547 US 1003 (2006) (footnote omitted). The United States retains any title vested in it before statehood to land beneath waterways *not* then navigable. *PPL Montana*, 565 US at ___, 132 S Ct at 1228.

Whether a river segment is navigable for purposes of determining state riverbed title is a question of federal law. *United States v. Oregon*, 295 US at 14 ("Since the effect upon the title to such lands is the result of federal action in admitting a state to the Union, the question, whether the waters within the state under which the lands lie are navigable or non-navigable, is a federal, not a local, one. It is, therefore, to be determined according to the law and usages recognized and applied in the federal courts, even though, as in the present case, the waters are not capable of use for navigation in interstate or foreign commerce." (Citations omitted.)); *United States v. Holt Bank*, 270 US 49, 55-56, 46 S Ct 197, 70 L Ed 465 (1926) ("Navigability, when asserted as the basis of a right arising under the Constitution of the United States, is necessarily a question of federal law to be determined according to the general rule recognized and applied in the federal courts.").

The test of navigability for that purpose is well established. In 1870, the United States Supreme Court explained:

> "Those rivers must be regarded as public navigable rivers in law which are navigable in fact. And they are navigable in fact when they are used, or are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water."[6]

---

[6] At statehood, a state also receives ownership of lands beneath tidal waters—that is, those influenced by the ebb and flow of the tide—without regard to the "navigable in fact" test. *Phillips Petroleum Co. v. Mississippi*, 484 US 469, 476, 108 S Ct 791, 98 L Ed 2d 877, *reh'g den*, 484 US 469 (1988). That rule does not apply in this case.

*The Daniel Ball*, 77 US (10 Wall) 557, 563, 19 L Ed 999 (1870).[7] Thus, the question of the navigability of a waterway is both factual and legal: whether the river segment is, in fact, navigable, also determines whether it is navigable for the legal purpose of determining state ownership under the equal-footing doctrine. *See United States v. Utah*, 283 US 64, 87, 51 S Ct 438, 75 L Ed 844 (1931) (navigability is essentially a question of fact determined by the particular circumstances of each case); *Loving v. Alexander*, 745 F2d 861, 865 (4th Cir 1984) (navigability involves "questions of law inseparable from the particular facts to which they are applied" (citing *United States v. Appalachian Elec. Power Co.*, 311 US 377, 404, 61 S Ct 291, 85 L Ed 243 (1940))).

## 2. *State process for asserting claim*

The State of Oregon has established a mechanism for asserting the state's claim of riverbed ownership under the federal doctrine. *See* ORS 274.400 - 274.412; OAR ch 141, div 121. That process vests in the board "exclusive jurisdiction to assert title to submerged or submersible lands in navigable waterways on behalf of the [state]."[8] ORS 274.402(1). The board may not exercise that authority unless either (1) a court has determined that the waterway is navigable and that determination is final, ORS 274.402(2)(a); or

---

[7] Although *The Daniel Ball* was an admiralty case, the Court has adopted the same test for determining "title navigability." *See, e.g., PPL Montana*, 565 US at ___, 132 S Ct at 1228; *United States v. Oregon*, 295 US at 15; *United States v. Utah*, 283 US 64, 76, 51 S Ct 438, 75 L Ed 844 (1931); *Holt Bank*, 270 US at 56 (1926); *Oklahoma v. Texas*, 258 US 574, 586, 42 S Ct 406, 66 L Ed 771 (1922). However, the Court has cautioned that "the test for navigability is not applied in the same way in these distinct types of cases," *PPL Montana*, 565 US at ___, 132 S Ct at 1228, and "each application of the *Daniel Ball* test is apt to uncover variations and refinements which require further elaboration," *id.* at ___, 132 S Ct at 1229 (internal quotation marks, brackets, and elipses omitted).

[8] ORS 274.005(7) defines "submerged lands" to mean "lands lying below the line of ordinary low water of all navigable waters within the boundaries of this state as heretofore or hereafter established, whether such waters are tidal or nontidal." ORS 274.005(8) defines "submersible lands" to mean "lands lying between the line of ordinary high water and the line of ordinary low water of all navigable waters and all islands, shore lands or other such lands held by or granted to this state by virtue of her sovereignty, wherever applicable, within the boundaries of this state as heretofore or hereafter established, whether such waters or lands are tidal or nontidal." The definitions in ORS 274.005 apply throughout ORS chapter 274, "unless the context requires otherwise." ORS 274.005.

(2) the board has made a declaration under ORS 274.406, ORS 274.402(b). It is the latter process that is at issue in this case.

The statutory scheme requires the board to adopt, by rule, a procedure under which the state "shall make a final administrative determination as to whether a waterway or part of a waterway is navigable, and if so, the extent of the interest claimed by the State of Oregon in the navigable portion of the waterway." ORS 274.404(1). The board may order the department to make a determination of navigability "if there is sufficient economic justification" for it or "a broad and substantial public interest." ORS 274.404(2)(a). If so ordered, the department must conduct a study of the issue, ORS 274.404(2)(a), and prepare a draft report for the board "setting forth the department's findings and conclusions as to whether the waterway or part of the waterway under study is navigable and, if so, the extent of the State of Oregon's interest in the waterway or part of the waterway," ORS 274.404(2)(c). After notice and public hearing, the board may adopt the draft report "if substantial evidence in the record supports the report's findings and conclusions." ORS 274.404(2)(e). If the board adopts the report, the board "shall declare the nature and extent of the state's claim to any interest that remains or is vested in the State of Oregon with respect to any land or waterway described in the report," ORS 274.406(1), and give reasonable public notice of the declaration to interested parties, ORS 274.408(1). As particularly relevant in this case, the notice must

"[d]escribe the land or waterway affected and the nature and extent of the state's claim. Such notice need not describe the land or waterway in legal terms, but by the use of common descriptions or maps shall be designed to identify the land or waterway in a manner intelligible to the layperson and useful in establishing the exact location of the state claim in relation to existing legal descriptions."

ORS 274.408(1)(a); *see also* OAR 141-121-0040(3)(a), (b) (providing that board's written declaration shall "[s]tate[] the nature and extent of the state's claim to the land underlying the subject waterway segment" and "[c]learly describe[] the location of the land claimed by the state using common

descriptions or maps designed to identify the land or water-way segment in a manner intelligible to the lay person and useful in establishing the exact location of the state claim in relation to existing legal descriptions"). Any person aggrieved by the state's declaration may seek judicial review of the declaration under ORS 183.484 (providing for judicial review of final orders in other than contested cases). ORS 274.412.

B. *Factual and Procedural History*

The Rogue River is 215 miles long and is bounded to the north by the Rogue-Umpqua Divide, to the east by the Cascade Mountains, to the south by the Siskiyou and Klamath Mountains, and to the west by the Klamath Mountains and the Pacific Ocean. It originates from Boundary Springs, at an elevation of 5,250 feet on the western side of the Cascades, and ends upon its confluence with the Pacific Ocean; it is fed by eight principal waterways and more than 2,500 other streams. According to the board, the river from its mouth (RM 0.0) to Grave Creek (RM 68.5) was declared navigable for title purposes in 1975.

Following the statutory and regulatory process out-lined above, in 2004, the board directed the department to conduct a navigability study of 89 miles of the Rogue River from Grave Creek at RM 68.5 to Lost Creek Dam at RM 157.5 (the study segment).[9] After two rounds of public comment and hearings, the department submitted its final Rogue River Navigability Report to the board. The report contained the department's findings of fact, relevant portions of which are set out below, 274 Or App at 275-77, and concluded, in part:

"[I]n 1859 the 89-mile study segment of the Rogue River was used or susceptible to being used in its ordinary and natural condition as a highway of commerce over which

---

[9] The request for a navigability study of this portion of the Rogue River was initially made in 1997 by the Josephine County District Attorney, who sought to clarify ownership and resolve actual and potential conflicts between river users and land owners along that stretch of the river. For a complete procedural history of the navigability study, see the Rogue River Navigability Report, pages 8-11, available at http://www.oregon.gov/dsl/NAV/pages/rogue_intro.aspx (accessed Oct 6, 2015).

trade and travel could have been conducted in the customary modes of trade and travel at that time; * * * the federal government did not reserve any portion of the study segment for any purpose prior to statehood that would prevent the transfer of ownership of the study segment to the state; and * * * the state has owned the land underlying the study segment of the Rogue River since statehood.

"Furthermore, the state's ownership extends to all lands located below the line of ordinary high water along the 89-mile study segment, unless lawfully conveyed or granted to another entity by the state since statehood and as affected by the principles of accretion, erosion and avulsion. The nature of the ownership includes two components: fee simple title (the jus privatum) and dominion as the public's trustee over the natural resource for public trust uses such as navigation, commerce, fisheries and recreation (the jus publicum)."

Addressing concerns that had been raised during the public-comment period about the effect of avulsive shifts in the river that had occurred since statehood, the report stated that, "although the general orientation of the waterway has not changed markedly since the mid-1850s and early 1900s, changes, often the result of major floods and consequent avulsive acts, have occurred along several lengths of the study segment."[10] In materials accompanying the report, the department acknowledged that, "[c]onsequently, at many locations, there is a good possibility that the river is not in the same location [as] it was at the time of statehood." However, the department explained, "[a]lthough this consideration will be important when determining the extent of state/private ownership should an assessment of state ownership be made by the Land Board, the navigability study process does not address the issue of whether events may have altered the location of property boundaries since statehood."[11]

---

[10] As discussed in more detail below, 274 Or App at 291 n 26, "avulsive" shifts are sudden, such as the result of flood, and do not affect ownership boundaries. On the other hand, changes due to accretion and erosion are gradual and do shift ownership boundaries. *See, e.g., Land Bd. v. Corvalis Sand & Gravel*, 283 Or 147, 161-65, 582 P2d 1352 (1978).

[11] As the department explained to the board, "[i]f the river is determined to be navigable, and therefore state-owned, a cloud on title will result where avulsion

The board adopted the findings and conclusions in the report, issued a declaration of ownership, and provided notice of that declaration to interested parties. The declaration stated, in part:

"(1)  The 89-mile study segment of the Rogue River is located in Josephine and Jackson Counties. The confluence of Grave Creek with the Rogue River is at River Mile 68.5 on the Rogue River and within Section 1, Township 34 South, Range 8 West of the Willamette Meridian within Josephine County. Lost Creek Dam (also known as the William L. Jess Dam) is on the Rogue River at River Mile 157.5 and within Section 26, Township 33 South, Range 1 East of the Willamette Meridian within Jackson County.

"(2)  The 89-mile study segment of the Rogue River is a title navigable waterway.

"(3)  The State of Oregon owns all rights, title, and interest in and to the lands located below the line of ordinary high water (as defined in [ORS] 274.005) along the 89-mile study segment of the Rogue River, unless lawfully granted or conveyed by the state since statehood on February 14, 1859, and as affected by the principles of accretion, erosion, and avulsion.

"(4)  The public has rights to use the title navigable reach of the 89-mile study segment of the Rogue River for public trust uses including fishing, navigation, commerce, and recreation."

Petitioners, who are property owners along or adjacent to the study segment, filed a petition for judicial review under ORS 183.484 in Jackson County Circuit Court challenging the state's declaration of ownership. At least some of those petitioners own property that is now dry land due to avulsive shifts of the river channel since 1859.

The parties ultimately filed cross-motions for summary judgment on two issues that are implicated on appeal: (1) whether the board's determination of navigability of the study segment was consistent with state and

---

has occurred. The agency will need to work with those landowners affected by avulsion to resolve ownership issues."

federal law and supported by substantial evidence in the record, and (2) whether the state's declaration of ownership satisfied the requirements of ORS 274.408(1)(a) and OAR 141-121-0040.[12]

On the navigability question, the circuit court concluded that substantial evidence supported the board's determination that the Rogue River was navigable from RM 68.5 to 100, but that the board's determination of navigability from RM 100 upriver to RM 157.5 "does not comply with federal or state law and is not supported by substantial evidence." Accordingly, the court granted the state's motion for summary judgment as to the navigability of the lower portion of the study segment (RM 68.5 to 100) and granted petitioners' motion for summary judgment (and denied the state's) as to the navigability of the upper portion of the study segment (RM 100 to 157.5).

Regarding the second issue—that is, the sufficiency of the declaration in light of the requirements of ORS 274.408 and OAR 141-121-0040—the circuit court granted petitioners' motion for summary judgment and denied the state's motion, concluding that the state's declaration was insufficient under ORS 274.408(1)(a) and thus must be set aside in its entirety. Although noting that the issue was "moot" in light of its ruling on the sufficiency of the declaration, the court also determined that the state's declaration of ownership unlawfully claimed ownership of "formerly submerged" or dry land—an issue that had been raised by petitioners' motion for partial summary judgment—because the declaration of ownership of dry land

---

[12] Petitioners did not initially move for summary judgment on the first issue—that is, on the ground that the board had erred in determining that the study segment was navigable. However, after the circuit court denied the state's motion for summary judgment on that ground as to RM 100 to 157.5, petitioners filed a second motion for summary judgment, contending that, as determined by the circuit court, the board's declaration of ownership for that portion of the study segment "must be set aside because it is not supported by substantial evidence in the record." As do the parties, we consider the parties' respective motions on the issue as cross-motions for summary judgment.

Intervenors Association of Northwest Steelheaders, Rogue Riverkeeper, and Northwest Environmental Defense Center joined in the state's motion for summary judgment and opposition to petitioners' motion for partial summary judgment. Those parties do not appear on appeal.

was outside the scope of the state's authority under ORS 274.400 to 274.412.

The court entered a general judgment reflecting those rulings and setting aside the declaration of ownership in its entirety. Subsequently, the court entered a supplemental judgment awarding petitioners costs and $157,101.87 in attorney fees. The state appeals both judgments under ORS 183.500.[13]

## II. ANALYSIS

### A. *Standard of Review*

Our function on appeal under ORS 183.500 "is to determine whether the circuit court correctly applied the standards of its review under ORS 183.484." *Hoekstre v. DLCD*, 249 Or App 626, 634, 278 P3d 123, *rev den*, 352 Or 377 (2012) (citations omitted). Under ORS 183.484(5)(a), the circuit court reviews to determine if "the agency has erroneously interpreted a provision of law"; under ORS 183.484(5)(c), court reviews for whether the agency order is "supported by substantial evidence in the record." "Substantial evidence exists to support a finding of fact when the record, viewed as a whole, would permit a reasonable person to make that finding." *Id.* The court must evaluate evidence for and against the finding in making that determination, and, "[i]f a finding is reasonable in light of countervailing as well as supporting evidence, the finding is supported by substantial evidence." *Garcia v. Boise Cascade Corp.*, 309 Or 292, 295, 787 P2d 884 (1990) (construing identical "substantial evidence" definition in ORS 183.482(8)(c)).

The circuit court's "evaluation of the record is limited to whether the evidence [before it] would permit a reasonable person to make the determination that the agency made in a particular case." *Norden v. Water Resources Dept.*, 329 Or 641, 649, 996 P2d 958 (2000) (citing *Garcia*, 309 Or at 295). Our role, in turn, is to "review[] the circuit court judgment to determine whether it correctly assessed the agency's

---

[13] ORS 183.500 provides:

"Any party to the proceedings before the circuit court may appeal from the judgment of that court to the Court of Appeals. Such appeal shall be taken in the manner provided by law for appeals from the circuit court in suits in equity."

decision under those standards. \* \* \* For the most part, that means that [we] directly review[] the agency's order under the standards set out in ORS 183.484(5)." *Ericsson v. DLCD*, 251 Or App 610, 620, 285 P3d 722, *rev den*, 353 Or 127 (2012) (citing *G.A.S.P. v. Environmental Quality Commission*, 198 Or App 182, 187, 108 P3d 95, *rev den*, 339 Or 230 (2005); *Hoekstre*, 249 Or App at 634).

B. *Navigability Determination*

For analytic coherence, we begin with the state's fourth and fifth assignments of error, in which the state contends that the circuit court erred in denying its motion for summary judgment and granting petitioners' motion on the issue of the navigability of the upper portion of the study segment—RM 100 to 157.5—"because substantial evidence in the circuit court record supported the Board's determination that the river segment was navigable at statehood.'" That is, in the state's view,

> "the record, viewed as a whole, would permit a reasonable agency to make the determination that river miles 100 to 157.5 were used, or [were] susceptible of being used, in their ordinary condition, as highways for commerce. Because substantial evidence supports those factual predicates, the Board is entitled to summary judgment on the issue of navigability."

Petitioners, on the other hand, defend the circuit court's ruling, contending that (1) "the state misinterpreted the federal standard for title navigability" and (2) the state's evidence of navigability, as developed during summary judgment briefing, would not permit a reasonable person to make the determination that the upper Rogue is navigable.[14] Thus—and as further refined at oral argument—we understand the parties ultimately to agree that the question before us on the issue of navigability is whether, under a proper understanding of the federal navigability standard, the record would permit a reasonable agency to make the determination that the upper portion of the study segment

---

[14] As noted, petitioners do not cross-appeal with respect to the circuit court's ruling that the board's determination of navigability as to the lower portion of the river—RM 68.5 to 100—was consistent with federal law and supported by substantial evidence.

was used or susceptible of being used in its ordinary condition at statehood as a highway of commerce.

Topographically, the upper portion of the study segment is described in the navigability report as follows:

> "As the river flows south from Shady Cove [RM 146], it is characterized over a distance of approximately 25 miles by numerous meanders along a generally flat valley floor. In the vicinity of Gold Hill [RM 119.5], it becomes confined to the bottom of a relatively open, often narrow valley until it reaches Grants Pass [RM 102]. *** Over this 59.5-mile segment [RM 146 to 86.5], the river's width typically ranges from 150 feet to 250 feet wide. However, in places it can exceed 300 feet in width.

> "Over this segment, the Rogue River drops from 1,295 feet to 847 feet above sea level which gives it an average gradient of approximately 7.5 feet per mile."

Above Shady Cove (RM 146), the waterway is confined to narrow, steep-walled canyons within the Cascade Range and the gradient is much steeper; from its origin to Shady Cove, the river falls nearly 4,000 feet with an average gradient of approximately 57 feet per mile.

Among the facts found by the board, the following pertain—at least in some part—to the upper portion of the study segment:

> "The use of canoes by Indians was reported by early explorers during the 1840s and 1850s at or in the vicinity of RM *** 102 (Grants Pass) and 110.5 (Evans Creek). *** In addition, there is reference [in an oral history taken of one of the last members of the Takelma Tribe] to the use of log rafts by Indians living upriver from Table Rock (RM 131[)].

> "Ferries were operated from the 1850s to early 1900s at approximately RM *** 102, 107.5, 110.5, 131.5, 140, and 146.

> "Wooden boats were used from the late 1890s to the early 1900s to transport goods and people primarily from Grants Pass (RM 102) to various points downriver. *** Evans Creek (RM 110.5) was also identified as the starting point for one trip downstream.

> "* * * * *

"Log drives were reported to have been conducted on an occasional basis and often with difficulty, from the 1880s to 1916 between various points on the upper study segment to Tolo/Gold Ray Dam (RM 125.5).

"Boating recreationists use a wide variety of watercraft along the entire 89-mile study segment.

"Although the general orientation of the Rogue River remains the same as it was at statehood, it has changed its course along various lengths of the study segment due to avulsion and accretion, a process which continues.

"The flow of the Rogue River through the study segment was at the time of statehood likely equal to or greater than it is today.

"Most of the recreational watercraft currently used on the Rogue River draw less than 8 inches when loaded with people and gear, and many 6 inches or less, and can use the study segment at a minimum flow of 800 to 900 cubic feet per second (cfs) with occasional scraping of the bottom of the watercraft or the need to portage around some obstacles.

"Flows of 1,000 cfs enable watercraft to use the water more easily, with a flow on the order of 1,400 cfs providing an even more pleasant experience.

"The United States Geological Survey (USGS) has determined that the minimum average monthly flow (after withdrawals for irrigation, municipal and domestic purposes) prior to the completion of Lost Creek Dam in 1977 at various points along the study segment over various recording periods was 1,160 cfs in August at Grants Pass (RM 102).

"The Oregon Water Resources Department reports:

"An 80% likelihood exists that a flow of 1,000 cfs or more would have occurred at the time of statehood and at all points along the study segment throughout the year except in September at the confluence of Elk Creek (RM 152); and

"A 50% likelihood exists that the lowest flow at any point along the study segment would be 1,150 cfs in October at the confluence of Elk Creek (RM 152).

"Indian dugout canoes and some other watercraft used in the Oregon territory at the time of Oregon statehood had a

draft of 6 to 8 inches of water. Current recreational water-craft now used through the study segment have the same floatability characteristics (3 to 8 inches of draft)."[15]

(Formatting altered.)

As mentioned, the circuit court concluded that the board's determination of navigability as to the upper portion of the study segment did not meet the federal test. The court found that, in contrast to the lower portion of the study segment between Grants Pass and Gold Beach, the upper portion "was almost entirely without * * * recorded evidence of usage for any purpose related to navigability." The court noted that, although there was evidence of Indians using canoes on the study segment, with the exception of one reference in the record to the sighting of an Indian canoe near RM 130, that use was from RM 110 downriver to RM 68.5. The court also noted the occurrence of "two log drives (with difficulty)" from RM 157.5 to 120; excerpts from expedition journals of the time, one of which indicated that the lower portion of the river was the only navigable portion, and another that found that the river was navigable from RM 35 to 70 and RM 90 to 120; and maps and survey notes from 1854 to 1919, finding "the river utterly devoid of any reports of usage." The court disregarded evidence of the use of ferries from RM 80 "all the way upriver" to RM 145, because, in the court's view, "ferries provide evidence that a river is more an 'obstruction' to commerce which must be overcome, than evidence the river was itself used for commerce." (Citation omitted.) The court further found that "[s]harp drops clearly make navigability difficult. Between Robertson Bridge (mile 86) and Shady Cove (mile 146) the drop is 7.5 feet per mile, while it's much steeper above Shady Cove." Thus, the court concluded that "[t]he upper portion of the Rogue River was neither used [n]or susceptible to use for travel and trade in the period of Oregon's statehood[,] 1859."[16]

---

[15] The specific findings themselves are undisputed; that is, petitioners do not contend that they are not supported by substantial evidence in the record.

[16] More specifically, the court concluded that "there is not substantial evidence in the agency record to support a finding of navigability for this portion of the river."

On appeal, the state first argues—briefly—that the circuit court "improperly compared the quantum of evidence relating to river miles 100 to 157.5 with the evidence of use on the lower portion of the study segment," and that, although the upper portion "was sparsely populated at the time of statehood, and there were few settlements and no commercial activity on the river in 1859," there was some evidence of use of canoes and log rafts by the upland Takelma Indians, who inhabited that area at the time. According to the state, that evidence is sufficient, under *Northwest Steelheaders Association*, 199 Or App at 482, and *Utah v. United States*, 403 US 9, 11, 91 S Ct 1775, 29 L Ed 279 (1971), to establish actual use of the river for commerce sufficient to meet the federal navigability standard. On that point, suffice it to say that we agree with the circuit court that the record does not permit a reasonable conclusion that the upper portion of the river was *actually* used as a "highway of commerce" at the time of statehood. Historical evidence in the record of *any* use by the upland Takelma Indians of canoes or log rafts on that portion of the river at the time of statehood is sparse; indications of use as a "highway for commerce" is essentially nonexistent. *See Oklahoma v. Texas*, 258 US 574, 591, 42 S Ct 406, 66 L Ed 771 (1922) (portion of river nonnavigable where use for transportation "has been and must be exceptional, and confined to the irregular and short periods of temporary high water"); *United States v. Oregon*, 295 US at 21-23 (shallow lakes nonnavigable where evidence of the use of boats was limited, fraught with difficulty, and involved no commercial aspects).

We turn to the state's primary argument—*viz.*, that the court "applied the wrong legal standard by looking only to evidence regarding actual use without also considering susceptibility of use," and substantial evidence supports the board's conclusion that the river segment was susceptible of use as a highway of commerce in 1859.

As an initial matter, the state is correct that navigability for title purposes can be established by showing that the river segment was *susceptible* of being used for trade and travel at the time of statehood. That alternative standard has been embodied in the navigability test since the test's inception. *See The Daniel Ball*, 77 US (10 Wall) at 563

("Those rivers * * * are navigable in fact when they are used, *or* are susceptible of being used, in their ordinary condition, as highways for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." (Emphasis added.)); *see also Northwest Steelheaders Association*, 199 Or App at 481 ("[T]he test for title navigability is, in fact, disjunctive: to sustain a state's claim to ownership of submerged lands, the river must have been *either* actually used for travel and trade at the time of statehood *or* susceptible for such use at the time of statehood." (Emphases in original.)). Moreover, the susceptibility-of-use standard as an independent prong of the navigability test was recently reaffirmed by the Supreme Court. *See PPL Montana*, 565 US at ___, 132 S Ct at 1233 ("True, river segments are navigable not only if they '[were] used,' but also if they '[were] susceptible of being used' as highways of commerce at the time of statehood." (Quoting *United States v. Utah*, 283 US at 76 (brackets in *PPL Montana*).)). Thus, we reject petitioners' suggestion that susceptibility of use in the absence of evidence of actual use is no longer a tenable feature of the federal test.

We also reject petitioners' suggestion (at oral argument) that the "susceptibility of use" standard is applicable only where the area in question was essentially uninhabited or only sparsely settled at the time of statehood. Although those may have been the extant circumstances in *United States v. Utah*, the Supreme Court did not then, and has not since, held that the susceptibility-of-use standard is so limited.[17] Indeed, the Court, in *PPL Montana*, cited *United States v. Utah* for the proposition that a river's "potential" for commercial use at the time of statehood is the "crucial"

---

[17] In *United States v. Utah*, 283 US at 83, the Court explained:

"[The state,] with its equality of right as a State of the Union, is not to be denied title to the beds of such of its rivers as were navigable in fact at the time of the admission of the State either because the location of the rivers and the circumstances of the exploration and settlement of the country through which they flowed had made recourse to navigation a late adventure, or because commercial utilization on a large scale awaits future demands. The question remains one of fact as to the capacity of the rivers in their ordinary condition to meet the needs of commerce as these may arise in connection with the growth of the population, the multiplication of activities and the development of natural resources."

question. *PPL Montana*, 565 US at ___, 132 S Ct at 1233 ("'[E]xtensive and continued [historical] use for commercial purposes' may be the 'most persuasive' form of evidence, but the 'crucial question' is the potential for such use at the time of statehood, rather than 'the mere manner or extent of actual use.'" (Quoting *United States v. Utah*, 283 US at 82-83 (brackets in *PPL Montana*).)). Notably, the Court did not circumscribe consideration of that "crucial" question to circumstances where only an absence of human habitation could explain the lack of evidence of actual use of the river for commercial purposes. Petitioners' suggestion to the contrary is not well taken.

Having determined the continued vitality and applicability of the susceptibility-of-use measure of navigability, we turn back to the state's arguments. We first note that, contrary to the state's view, the circuit court *did* consider susceptibility of use when it determined that the state had not proved navigability of the upper portion of the river. Citing *United States v. Utah*, the court recognized that "[t]he test isn't limited to actual use but can also include 'susceptibility' to use or 'capacity to carry travel and trade'" and, in the discussion that followed, included reference to evidence of post-statehood use of the river, including boat trips, log drives, and ferries. It also observed that "[s]harp drops clearly make [navigation] difficult," citing evidence of the river's drop of 7.5 feet per mile at Shady Cove (RM 154), and noting that "it's much steeper" above that point. Although the court did not explain its reasoning in detail, those considerations informed the court's conclusion that the "upper portion of the Rogue River was neither used [*n*]*or susceptible to use* for travel and trade in the period of Oregon's statehood[,] 1859." (Emphasis added.) In short, we cannot say that the circuit court did not consider the issue.

The question thus reduces to whether the circuit court's conclusion—that the upper portion of the river was not susceptible to navigation in 1859—is correct under a proper understanding and application of the law.

Susceptibility of use for commerce must be assessed based on the natural and ordinary conditions of the river

at the time of statehood. *PPL Montana*, 565 US at ___, 132 S Ct at 1233 ("[I]t must be determined whether trade and travel could have been conducted 'in the customary modes of trade and travel on water,' over the relevant river segment 'in [its] natural and ordinary condition.'" (Quoting *United States v. Utah*, 283 US at 76 (brackets in *PPL Montana*).)). That capacity "may be shown by physical characteristics and experimentation as well as by the uses to which the streams have been put." *United States v. Utah*, 283 US at 83. Thus, post-statehood evidence, including evidence of present-day use, "depending on its nature," may inform the question of susceptibility of commercial use at the time of statehood. *PPL Montana*, 565 US at ___, 132 S Ct at 1233. However, "the evidence must be confined to that which shows the river could sustain the kinds of commercial use [that is, trade and travel] that, as a realistic matter, might have occurred at the time of statehood." *Id.*; *see also United States v. Utah*, 283 US at 86 ("[T]he vital and essential point is whether the natural navigation of the river is such that it affords a channel for useful commerce.").

The state relies on three categories of post-statehood evidence that, in its view, "would lead a reasonable person to conclude that [the upper portion] of the river was suscepti-ble of use as a highway of commerce in 1859": (1) log drives; (2) recreational boating and fishing; and (3) the use of ferries, which, in the state's view, supports a determination that "the Rogue above mile 100 was wide enough and deep enough to serve as a highway of commerce." As explained below, we conclude that evidence of log drives and recreational boating and fishing use on the upper portion of the river is prop-erly considered under the federal "susceptibility" test. We further conclude that, together, that evidence would permit the reasonable conclusion that that segment of the river was susceptible of use as a channel of commerce at the time of statehood.[18]

We begin with the question of log drives. The state contends that there is abundant evidence in the record that

---

[18] As a result, we need not address the parties' arguments with respect to evidence of post-statehood ferry use, except to note that such usage would not, in any event, *defeat* a finding of navigability based on the other evidence.

log drives were conducted on the upper portion of the river near Gold Ray Dam (RM 126) beginning as early as 1889 and continuing into the early 20th century; for example, it points to contemporaneous newspaper accounts describing such drives from the area of Peyton (RM 162) to a sawmill at Tolo (RM 125.5). In the state's view, that evidence demonstrates that the upper portion of the river was susceptible of navigation for commercial purposes—timber transport—at the time of Oregon's statehood in 1859.

Petitioners do not dispute the state's evidentiary assertion; rather, their sole response is that, "[a]s a matter of law, the state's reliance on log drives is based on a misinterpretation of the federal test." In support of that proposition, they assert that "[t]he Supreme Court has never accepted log drives as indicative of navigation for title." Petitioners acknowledge that, in *United States v. Utah*, 283 US at 79, the Court looked *favorably* on evidence of the transportation of "lumber rafts" as demonstrating a river's potential for commercial navigation. Nonetheless, petitioners reason that "lumber rafts" are distinguishable from "log drives" in that the latter, even if evidence of "trade," do not demonstrate "travel," because there is nothing to indicate that people were travelling down the river *on* the logs, and the federal test requires both trade and travel. However, nothing in the Supreme Court's decision in *Utah* supports that distinction—there is no indication that the "log rafts" accepted as evidence of navigability in that case were transporting people (as well as logs) down the river, and that fact is not self-evident.

Petitioners also point to *United States v. Rio Grande Irrigation Co.*, 174 US 690, 698, 19 S Ct 770, 43 L Ed 1136 (1899), in which the Supreme Court held that "[t]he mere fact that logs, poles and rafts are floated down a stream occasionally and in times of high water does not make it a navigable river." However, that statement does not equate to the proposition that log drives cannot, no matter their extent, evidence a river's capacity for navigation. It simply means that occasional use of a river for that purpose does not suffice—on its own—to satisfy the susceptibility-of-use standard.

Petitioners also challenge the state's reliance on *State of Or., Etc. v. Riverfront Protection Ass'n*, 672 F2d 792, 795 (9th Cir 1982), as support for its position that log drives are evidence of a waterway's capacity for use as a channel of commerce. In that case, the Ninth Circuit held that the transportation of logs on the McKenzie River in Oregon, although difficult and seasonal, was sufficient to establish that the river was navigable for title purposes. The court determined that, unlike in *Rio Grande Irrigation Co.*, log drives on the McKenzie did not depend on high water—the river was "too swift, deep, and dangerous for logdriving" during those periods. *Id.* Nonetheless, the court held that the log drives established use of the river for purposes of commerce because they were not merely "occasional"—they occurred during several months each year over a period of many years and "[t]housands of logs and millions of board feet of timber were driven down the river." *Id.*

In petitioners' view, *Riverfront Protection Ass'n* is no longer apt, in light of *PPL Montana*, because, in deciding the case, the Ninth Circuit relied on decisions—in particular, *Puget Sound Power & Light v. Federal Energy, Etc.*, 644 F2d 785 (9th Cir), *cert den*, 454 US 1053 (1981)—that had determined navigability for the "doctrinally distinct" purpose of federal regulatory jurisdiction under 16 USC section 796(8) (1976). However, petitioners do not explain why that different context compels a different analysis in this case, and we perceive none. To be sure, as noted earlier, the Court cautioned in *PPL Montana* that *The Daniel Ball* formulation of the navigability test is "not applied in the same way" in all contexts; for example, the Court noted that, unlike in the title context, where navigability is assessed at the time of statehood and is based on the natural and ordinary condition of the water, "federal regulatory authority encompasses waters that only recently have become navigable, were once navigable but are no longer, or are not navigable and never have been but may become so by reasonable improvements." 565 US at ___, 132 S Ct at 1228 (citations omitted). However, in *Puget Sound Power & Light*, the sole issue was whether the evidence established "that in the past, the White River was either used, or was susceptible of being used, in its natural and ordinary

condition as a highway for useful commerce," 644 F2d at 787—that is, there was no contention that the river segment was presently navigable or could be made navigable through reasonable improvements. Thus, the court applied the same standard that is applied to determine title navigability. Accordingly, we see no reason to disregard *Riverfront Protection Ass'n*, and, although it is not controlling, we find its reasoning persuasive.

In sum, we disagree that the state has "misinterpret[ed]" the federal test with respect to its use of log-drive evidence. And, in the absence of any contention by petitioners that the state's evidence is deficient as a matter of fact—that is, that it is insufficient to demonstrate more than occasional, temporary use of the river for timber transport—*see, e.g., United States v. Utah*, 283 US at 87 (evidence adequate to support master's determination that river segments were navigable because "susceptibility of use as a highway for commerce was not confined to exceptional conditions or short periods of temporary high water")—we conclude that evidence of log drives occurring on the upper portion of the river from the 1880s to 1916 provides at least some indication that the river was susceptible of use for commerce at statehood.

We next consider the question of post-statehood recreational use of the river, which, the state asserts, demonstrates the river's navigability under the susceptibility-of-use measure. As noted, the board found that "[b]oating recreationists use a wide variety of watercraft along the entire 89-mile study segment." According to the navigability report, kayakers, rafters and anglers in drift boats use the entire length of the study segment, including the upper portion, although, as the report notes, the stretch between Grants Pass (RM 102) and Gold Ray Dam (RM 126) is used less intensively for recreation than other segments because of the need to portage around the Gold Ray Dam (RM 126) and Savage Rapids Dam (RM 107.5). It further found that the uppermost section—from Gold Ray Dam to Lost Creek Dam (RM 157.5)—is "considerably calmer" than the lower sections of the river but is "also extensively used by kayakers, rafters and anglers in drift boats."

Petitioners contend that that evidence has no bearing on the navigability determination under the susceptibility-of-use test set out in *PPL Montana*. We disagree.

In *PPL Montana*, the Court held that, because the susceptibility analysis turns on whether trade and travel could have been conducted "in the customary modes of trade and travel on water" over the river segment at issue in its "natural and ordinary condition,"

> "[a]t a minimum * * *, the party seeking to use present-day evidence for title purposes must show: *(1) the watercraft are meaningfully similar to those in customary use for trade and travel at the time of statehood, and (2) the river's poststatehood condition is not materially different from its physical condition at statehood.* If modern watercraft permit navigability where the historical watercraft would not, or if the river has changed in ways that substantially improve its navigability, then the evidence of present-day use has little or no bearing on navigability at statehood."

565 US at ___, 132 S Ct at 1233 (emphasis added; internal quotation marks and citations omitted). Because the Montana Supreme Court had relied on evidence of present-day recreational use of the Madison River without determining those prerequisites, the Supreme Court reversed. The Court noted that the state court "did not find the watercraft [to be] similar to those used at the time of statehood, and the State's evidence of present-day use for recreational fishing did not indicate what types of boats are now used." *Id.* at ___, 132 S Ct at 1234.[19] Moreover, the Montana court did not properly assess expert evidence about changes to the river's flow and channel since statehood, which suggested that, due to the construction of dams, "the river may well be easier to navigate now than at statehood." *Id.* at ___, 132 S Ct at 1234. As a result, the Court held that the state's evidence of present-day recreational use of the river did not bear on the title navigability question, and—"at least without further inquiry"—the Montana Supreme Court erred as a matter of law in relying on it. *Id.* at ___, 132 S Ct at 1234.

---

[19] The Court observed that "[m]odern recreational fishing boats, including inflatable rafts and lightweight canoes or kayaks, may be able to navigate waters much more shallow or with rockier beds than the boats customarily used for trade and travel at statehood." *PPL Montana*, 565 US at ___, 132 S Ct at 1234.

Petitioners contend that similar deficiencies are inherent in the state's evidence of present-day recreational use in this case and, consequently, the circuit court correctly (if implicitly) disregarded that evidence in concluding that the upper river segment was not susceptible of use for commerce. They assert that the state's analysis of modern-day watercraft versus that customarily used at statehood is flawed; moreover, petitioners point out that, according to the state's own navigability report, "'the flow of the Rogue River today at various points along the study segment is not representative of that which existed at the time of statehood,'" due to the construction of dams and the use of water for irrigation, municipal, and domestic purposes.

We are not persuaded.

Regarding *PPL Montana*'s first requirement—that the recreational watercraft in use today are "meaningfully similar" to those customarily used for trade and travel at the time of statehood—the board compared the "draft" requirements of current recreational watercraft with those of the dugout canoes and other watercraft commonly used by Native Americans in the Oregon territory at the time of statehood, finding that the two had similar "floatability characteristics."[20] Specifically, it found that "most" of the current recreational watercraft "draw less than 8 inches when loaded with people and gear, and many 6 inches or less," and that the watercraft typically used in 1859 had a draft of 6 to 8 inches.

The board also analyzed the flow requirements of the recreational watercraft used on the river today. It found that most of the watercraft can use the entire length of the study segment "at a minimum flow of 800 to 900 cubic feet per second (cfs) with occasional scraping of the bottom of the watercraft or the need to portage around some obstacles," although flows of 1000 cfs provide for easier use. It also found that there was an 80 percent likelihood that a flow of 1,000 cfs or more would have occurred at statehood all

---

[20] The "draft" of a ship is "the depth of water a ship draws esp. when loaded." *Webster's Third New Int'l Dictionary* 683 (unabridged ed 2002). In this context, "draw" means "to require (a specified depth) of a supporting medium in which to float <a ship that ~s 12 feet of water>." *Id.* at 686.

along the study segment except in September as measured at Elk Creek (RM 152). As to that "exception," the navigability report further establishes an 80 percent likelihood that a flow of at least 900 cfs would have occurred throughout the year on the entire length of the study segment. Based on those data, we understand the board to have found that the flow requirements for current recreational boats all along the study segment—including the upper portion—are similar to those for the dugout-type canoes that were customarily used by Native Americans in the area for trade and travel in 1859;[21] in other words, watercraft in 1859 would permit navigability to the same or similar extent as modern watercraft. *PPL Montana*, 565 US at ___, 132 S Ct at 1233-34.[22] In our view, that analysis is sufficient to establish that present-day and historical watercraft are "meaningfully similar" under the federal test.

The state's evidence also satisfies *PPL Montana*'s second requirement—that the river's post-statehood condition not be "materially different" than its condition at statehood. The board found that the flow of the Rogue River through the study segment was, at statehood, "likely equal to or greater than it is today"—a finding that petitioners do not contest. In particular, the report found, based on the examination of cadastral maps, historical data from USGS survey gauges, and information drawn from the Oregon Water Resources Department's "Water Availability Reporting System" model, that the river's flow from RM 68.5 to 157.5 was "most likely greater at the time of statehood * * * than it is today" due to the construction of dams and the

___

[21] We reject petitioners' argument that the state's evidence fails because there is no evidence of Native American use of dugout-type canoes specifically on that portion of the river. That understanding would, in many instances, essentially negate the susceptibility-of-use standard of navigability. In our view, the state's comparison of present-day watercraft with watercraft in use for trade and travel in the general area (for example, on the lower portion of the study segment) and throughout the Oregon territory was reasonable and suffices under the *PPL Montana* test. *Cf. Northwest Steelheaders Ass'n*, 199 Or App at 486 (considering draft characteristics of dugout canoes used by "various Native American tribes in the Columbia River basin" and those of modern boats in concluding that river was susceptible to navigation).

[22] In *PPL Montana*, the Court confirmed that "a river need not be susceptible of navigation at every point during the year," but "neither can that susceptibility be so brief that it is not a commercial reality." 565 US at ___, 132 S Ct at 1234.

withdrawal of water from the river for irrigation and domestic and municipal use. Thus, the state's evidence indicates that, if anything, navigation is likely *more* difficult today than it was at statehood. *See PPL Montana*, 565 US at \_\_\_, 132 S Ct at 1234. ("[I]f the river has changed in ways that substantially improve its navigability, then the evidence of present-day use has little or no bearing on navigability at statehood.").

Thus, the board's analysis of the physical conditions of the river, as well as its comparative assessment of watercraft in use at statehood and today satisfies the requirements of *PPL Montana* and permits the conclusion that the upper portion of the river was capable—at statehood—of sustaining travel and trade by means of dugout canoes.

In sum, the occurrence of log drives on the upper portion of the river post-statehood, and evidence of present-day boating use of that portion of the river, support the conclusion that the river's conditions at the time of statehood would have permitted use of the river as a highway of commerce—that is, for timber transport and canoe-based travel and trade. *Cf. Northwest Steelheaders Association*, 199 Or App at 486-88 (concluding, on *de novo* review, that river segments were susceptible of navigation at time of statehood, based on hydrologic conditions of the river and evidence of post-statehood use—including modern recreational boating, a log drive, and sternwheeler traffic). In other words, the state's evidence of post-statehood log drives and present-day recreational use of the upper portion of the river permits the reasonable conclusion that that segment— RM 100 to 157.5—was, at statehood, "susceptible of being used, in [its] ordinary condition, as [a] highway[] for commerce, over which trade and travel are or may be conducted in the customary modes of trade and travel on water." *The Daniel Ball*, 77 US (10 Wall) at 563. Because navigability for title purposes may be established based on susceptibility of use, we conclude that the circuit court erred in concluding that the board's determination of navigability from RM 100 to 157.5 did not comply with federal law and was not supported by substantial evidence, and we reverse that ruling.

C. *Declaration of Ownership Under Oregon Law*

We turn back to the state's first three assignments of error, in which the state challenges the circuit court's determination that the board's declaration of ownership of the bed and banks underlying the 89-mile study segment fails to comply with Oregon law. In its first two assignments, the state contends that the circuit court erred in granting petitioners' motion for summary judgment, and denying its motion, on the question of the sufficiency of the board's declaration under ORS 274.408(1)(a) and OAR 141-121-0040(3). In its third assignment, the state asserts that the court erred in granting petitioners' motion for summary judgment that challenged the declaration on the ground that the declaration claims title to formerly submerged or dry land, which the board lacks authority to do under ORS 274.400 to 274.412. We consider those issues in turn, reviewing the circuit court's rulings for legal error. *See* 274 Or App at 273-74 (discussing standard of review).

Once again, ORS 274.408(1)(a) requires the board to issue public notice of its declaration of ownership, which "shall"

"[d]escribe the land or waterway affected and the nature and extent of the state's claim. Such notice need not describe the land or waterway in legal terms, but by the use of common descriptions or maps shall be designed to identify the land or waterway in a manner intelligible to the layperson and useful in establishing the exact location of the state claim in relation to existing legal descriptions."[23]

And, the board's notice provided, as relevant:

"The State of Oregon owns all rights, title, and interest in and to the lands located below the line of ordinary high

---

[23] Similarly, OAR 141-121-0040(3) requires the board to issue a written declaration that, as relevant here

"(a) States the nature and extent of the state's claim to the land underlying the subject waterway segment; [and]

"(b) Clearly describes the location of the land claimed by the state using common descriptions or maps designed to identify the land or waterway segment in a manner intelligible to the lay person and useful in establishing the exact location of the state claim in relation to existing legal descriptions[.]"

water (as defined in [ORS] 274.005[24]) along the 89-mile study segment of the Rogue River, unless lawfully granted or conveyed by the state since statehood on February 14, 1859, and as affected by the principles of accretion, erosion, and avulsion."[25]

In concluding that that notice was inadequate, the circuit court explained, in part:

"The State takes the position that it is free simply to tell the private property owners and users of the river that it is sufficient merely to say in some vague fashion, 'We (the State of Oregon) own some of this land,' but is likewise free to defer to some later date and later process the determination of where this land is actually located. As stated above, the law clearly requires much more and since the law states a lay person should be able to identify the location of the State's claim (OAR 141-121-0040(3)), this declaration is woefully insufficient."

On appeal, the state argues that its notice satisfies the requirements of ORS 274.408(1)(a) and the circuit court erred in concluding otherwise by "read[ing] into the statute a requirement that the state provide something akin to a legal description of the affected land," which the statute rejects; the state also argues that the statute does not require the notice to specify the "exact" location of the state's claim, only that it be " 'useful in establishing' that exact location," and its notice did that. The state's general thesis is that the phrasing "useful in establishing the exact location of the state claim," read in context and in light of the statute's legislative history, establishes that the legislature intended to allow the state to do what it did here—*viz.*, claim

---

[24] Under ORS 274.005(3), " '[l]ine of ordinary high water' means the line on the bank or shore to which the high water ordinarily rises annually in season."

[25] The declaration also described the general area of the study section:

"The 89-mile study segment of the Rogue River is located in Josephine and Jackson Counties. The confluence of Grave Creek with the Rogue River is at River Mile 68.5 on the Rogue River and within Section 1, Township 34 South, Range 8 West of the Willamette Meridian within Josephine County. Lost Creek Dam (also known as the William L. Jess Dam) is on the Rogue River at River Mile 157.5 and within Section 26, Township 33 South, Range 1 East of the Willamette Meridian within Jackson County."

The state does not contend—nor credibly could it—that that general description adds anything to our analysis of the state's claim of error.

ownership of the land underlying the river "as it exists today subject to whatever changes have occurred in the course of the river since statehood through the 'principles of accretion, erosion, and avulsion,'" with any resulting title issues resolved through subsequent negotiation or litigation.[26]

Although we agree with the state that the statute does not require a legal description or an "exact" location of the state's claim of ownership, we nonetheless conclude that it requires more specificity than the state's notice provided here. In other words, we agree with the circuit court that the notice of declaration fell short of what is required under the statute.

We begin with an analysis of the text of ORS 274.408(1)(a), in context, which reveals several salient features that undermine the state's argument. To begin, the opening sentence of the statute requires the notice to describe both the nature and "extent" of the state's claim. "Extent" means, as relevant, "the range (as of inclusiveness or application) over which something extends : SCOPE, COMPASS, COMPREHENSIVENESS"; "the point or degree to which something extends"; "the amount of space which something occupies or the distance over which it extends : the length, width, height, thickness, diameter, circumference, or area of something." *Webster's Third New Int'l Dictionary* 805 (unabridged ed 2002). Thus, the legislature contemplated some delineation of the boundaries of the state's claim.

The second sentence of the statute qualifies that requirement further, providing that, although the description need not use "legal terms," it must, "by the use of common descriptions or maps * * * be designed to identify

---

[26] It is undisputed that major changes to the study segment of the Rogue River have taken place since statehood as the result of both accretion and avulsion. "Accretion" refers to gradual changes in the course of a river or the contours of its banks; under common-law principles, *where there have been changes due to accretion, the boundary line follows the water*, even though the changes may have altered the actual location of the high-water line. *Land Bd. v. Corvallis Sand & Gravel*, 283 Or 147, 161-62, 582 P2d 1352 (1978). On the other hand, "avulsion" refers to sudden changes to the course of the river or its banks, such as by flooding; *avulsive changes do not result in a change of ownership in the riverbed. Id.* at 167. Thus, it is apparent that the state's declaration of ownership includes portions of the 1859 river channel that are now dry land.

the land or waterway in a manner intelligible to the layperson and useful in establishing the exact location of the state claim in relation to existing legal descriptions." Parsing that sentence, we note several terms and phrases of consequence.

First, the statute refers to "common descriptions or maps," indicating a verbal or graphic depiction of the state's claim that is adequate under ordinary standards to inform the knowledge or understanding of others. *Id.* at 458 (meaning of adjective "common" includes "satisfying accustomed criteria : attaining to an ordinary standard : ADEQUATE"); *id.* at 610 ("description" means "the act or an instance of describing"); *id.* (to "describe," in turn, means "to represent by words written or spoken for the knowledge or understanding of others").

Second, the description of the state's claim must be "designed to identify the land or waterway in a manner intelligible to the layperson." Thus, it should be capable of being understood by a person without specialized skills or training. *See id.* at 1175 ("intelligible" means "capable of being understood or comprehended"); *id.* at 1281 ("layman" means "one not belonging to some particular profession or not expert in some branch of knowledge or art").

Third, it must be "useful in establishing the exact location of the state claim in relation to existing legal descriptions." As discussed above, that is the phrase that the state seizes on, particularly the word "useful." "Useful" means "capable of being put to use : having utility : ADVANTAGEOUS * * * *esp.* : producing or having the power to produce good : serviceable for a beneficial end or object." *Id.* at 2524. Thus, as the state argues—and we agree—the description need not definitively establish the exact location of the state's claim. However, it must be beneficial in ascertaining that location and it must do so—and this the state ignores entirely—*in relation to existing legal descriptions.*

In the context of the statute as a whole, those "existing legal descriptions" are most reasonably understood to refer to legal descriptions of property surrounding or affected by the state's claim of ownership. Significantly, subsection (2) of ORS 274.408 requires the board to "[s]end to each *owner*

*of record of land described in the declaration* a copy of the declaration made with respect to the land and a statement advising such owner that any aggrieved party may seek judicial review of the declaration." (Emphasis added.) *See also* ORS 274.404(2)(d) (rules must require that public notice of draft navigability report be provided to "affected property owners and other interested parties"); ORS 274.408(1) (reasonable public notice of the board's declaration must be given to "interested parties"); ORS 274.408(1)(b) (notice of declaration must "[a]dvise that any person aggrieved by the declaration may seek judicial review of the declaration"); ORS 274.412 ("Any person who is aggrieved by a declaration of the [board] made pursuant to ORS 274.406 may seek judicial review of the declaration * * *."). Thus, the statutory scheme contemplates that the common descriptions or maps provided will be specific enough to allow an ordinary person to ascertain the exact location of the state's claim in relation to existing property lines so that the person can take steps to participate in the process and contest the declaration if desired.

Here, as petitioners point out, the state's notice of declaration would, if approved, turn that scheme on its head. The notice states that the state is claiming title to the lands located below the high water line along the 89-mile study segment, as "affected by the principles of accretion, erosion, and avulsion"—that is, as those principles have changed the boundaries of the land that the state is claiming. Thus, the notice leaves it up to a potentially affected property owner or other interested party to, first, figure out where the river channel was in 1859 and, then, apply the legal principles governing water boundary movement—that is, "accretion, erosion, and avulsion"—to try to ascertain the specific parameters of the state's claim in relation to existing property lines. As discussed above, the legislature placed that burden on the state, not on potentially affected property owners.

The state contends that the legislative history supports its view that the administrative procedure established by the legislature in ORS 274.400 to 274.412 was not intended to result in a final determination of ownership of land and that specific title issues would be resolved

through subsequent litigation or negotiation.[27] We do not disagree with that proposition, as far as it goes. *See, e.g.,* Tape Recording, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2697, Mar 30, 1995, Tape 46, Side A (statement of William Holmes, Sandy River Property Owners Association) ("Once the division goes through this process and makes an administrative determination, that is not really a final determination as to who owns the land."); *id.* ("[T]he only entity that can make a final decision as to navigability and ownership is a federal court."); *id.* (statement of Gary Gustafson, Division of State Lands) ("The only way to get finality if there is a challenge is through a court process."); Tape Recording, Senate Committee on Water and Land Use, May 18, 1995, Tape 148, Side A (statement of Bill Perry, Oregon Farm Bureau) (stating that only federal court has the ability to make final determination on title navigability). In fact, our review of the history of HB 2697 reveals that the legislature expressly rejected an amendment to the bill that would have required the state to obtain such a final ownership determination by obtaining a quiet-title decree in federal court. *See* Tape Recording, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2697, Apr 21, 1995, Tape 72, Side A (statement of William Holmes) (explaining proposed section 8 to HB 2697); *id.* (statement of Rep Leslie Lewis, Subcommittee Chair) (expressing reluctance to move forward with section 8 because it would require a referral to the Committee on Ways and Means, which "might kill the bill" and stating that section 8 would not be considered); *see also* Exhibit U, Senate Committee on Water and Land Use, HB 2697, May 18, 1995 (proposed section 8 to A-Engrossed HB 2697). The bill passed the House and Senate without the amendment.

---

[27] As support for that proposition, the state also cites ORS 274.406(3), which states:

"Nothing contained in this section is intended to affect the ability of a court of competent jurisdiction to make a determination with respect to a private claim to or interest in real property."

As discussed below, we do not disagree with the state that the declaration was not intended to be a final determination of property lines, as the subsection confirms. The problem with the state's argument is that it does not lead to the conclusion that the state wishes us to draw, *viz.*, that its notice was sufficiently descriptive to meet the requirements of ORS 274.408(1)(a).

Nothing about that lack of finality, however, demonstrates that the legislature intended, as the state now contends, to "permit[] the state to assert ownership of the waterway prior to determining exactly how the course of the waterway had changed [through the process of accretion, erosion, and avulsion] since the date of statehood." And, there is nothing in the history proffered by the state (or that we have found) that speaks directly to the question of the meaning of ORS 274.408(1)(a). But, the legislative history—like the words themselves—demonstrates that the legislature intended to make the extent of the state's claim of ownership reasonably certain to people who might be affected by the claim.

The impetus for the bill arose out of a dispute between the state and property owners along the Sandy River after the Division of State Lands, through the Department of Revenue, directed Multnomah County to alter its records to reflect state ownership, under the equal-footing doctrine, of the bed and banks of the Sandy River. *See, e.g.,* Testimony, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2697, Mar 8, 1995, Ex K (statement of John R. Urquhart, property owner). The affected property owners did not learn of the purported ownership change until they received their property tax statements, which reflected less land than described in their deeds. *Id.* The bill—as revised by a workgroup appointed for that purpose—required the board to establish rules for making navigability determinations that would "make sure that people have had an opportunity to get their two cents [in] on whether a given river is navigable or whether the high water line is in one place or another." Tape Recording, House Committee on Natural Resources, Subcommittee on Energy and Environment, HB 2697, Mar 30, 1995, Tape 46, Side A (statement of William Holmes). As the director of the Division of State Lands explained, the bill "provides a process for the Division of State Lands to use when we make navigability claims of state waterways *to determine what is state owned and what is not.*" Tape Recording, Senate Committee on Water and Land Use, A-Engrossed HB 2697, May 18, 1995, Tape 148, Side A (statement of Gary Gustafson) (emphasis added). The state's notice, claiming

ownership to lands below the ordinary high water line of the river segment "as affected by the principles of accretion, erosion, and avulsion," without more, fails to accomplish that legislative purpose.

In short, the text, context, and legislative history of the statute indicate that, although a specific legal description of the state's claim is not required, the notice of declaration must provide enough information to allow an ordinary person who might be affected by the declaration to ascertain the boundaries of the state's claim in relation to existing properties. The state's notice in this case did not do that. Thus, whatever the exact parameters of ORS 274.408(1)(a), we agree with the circuit court that the state's "description" here was insufficient under the statute, and the declaration must be set aside in its entirety.

Given that conclusion, it is not strictly necessary for us to resolve the state's third assignment of error, which challenges the circuit court's conclusion that the declaration also fails because ORS 274.400 to 274.412 does not grant authority to the state to claim what is now dry land. *See* 274 Or App at 291 n 26 (explaining that the state's declaration includes dry land, because it asserts ownership subject to the rule of avulsion, and it is undisputed that avulsive changes have occurred to some portions of the study segment since statehood). However, because the issue is almost certain to arise on remand, we address it.

Petitioners argued below that the authority for the state to claim "formerly submerged lands" is governed exclusively by a different statutory procedure—ORS 274.960 to 274.985, enacted in 1973, *see* Or Laws 1973, ch 329—which authority has now expired. The circuit court agreed and granted petitioners' motion for partial summary on that basis, reasoning that

> "ORS 274.960 clearly was designed to deal with lands considered to be formerly submerged. * * * Since such lands were not included in ORS 274.400 - 274.412 the declaration in this case cannot be used to claim such lands, and for this reason the declaration also fails."

(Underscoring in original.) As explained below, we conclude that the court erred in granting petitioners' motion on that basis.

As mentioned earlier, ORS 274.402 grants the board "exclusive jurisdiction to assert title to *submerged or submersible lands* in navigable waterways on behalf of the State of Oregon," and the statutes that follow establish the process for the board to follow in making such a declaration of title.[28] (Emphasis added.) ORS 274.965, on the other hand, requires the board to direct the department to "determine whether any interest remains or is vested in the State of Oregon with respect to land that was *formerly submerged or submersible land* within the bed and banks of a navigable body of water in this state," ORS 274.965(1) (emphasis added), and requires that the board and the department complete those duties before July 1, 1979. ORS 274.965(3), (4). Petitioners contend that, because ORS 274.965 and its statutory scheme specifically apply to "formerly submerged or submersible" lands, and ORS 274.400 to 274.412 do not, the board lacked authority under the latter to include dry land in its declaration. In other words, petitioners contend that the authority established in ORS 274.960 to 274.985, which has now expired, represented the only means by which the state could assert an ownership interest in what is presently dry land and that, accordingly, those areas of the study segment to which the state was claiming ownership due to avulsion should have been carved out of the state's declaration.[29]

The state disagrees, arguing, as we understand it, that the state's claim of ownership under the process established in ORS 274.400 to 274.412—which is premised on title navigability under the equal-footing doctrine—is necessarily determined based on whether the land was submerged or submersible *at statehood* and thus may encompass dry land if the river channel has changed due to avulsion since that time. And, the state argues, ORS 274.960 to 274.985

---

[28] Except as it may be modified on judicial review, the state's declaration is "binding on the State of Oregon with respect to the interest, if any, of the State of Oregon in any land or waterway described in the declaration." ORS 275.406(2).

[29] Specifically, petitioners argue that, "[w]hen the legislature enacted ORS 274.400 to 274.412 in 1995, it was presumed to have known of the law addressing formerly submerged and submersible lands and, had it intended to alter that law or include the right to assert title to formerly submerged and submersible lands with the navigability study statute[, ORS 274.400 to 274.412], it could have done so expressly."

is not inconsistent with that understanding because it "was intended to apply to lands that had originally been part of waterways *already determined to be navigable.*" (Emphasis added.) In other words, ORS 274.960 to 274.985 was not intended to be the exclusive means for asserting (under title-navigability principles) ownership of land that is no longer submerged or submersible but, instead, was intended to apply only to such land in waterways that were already understood to be navigable.

Although imperfect, we conclude that the state's reading best harmonizes the two statutory schemes. *See State ex rel DHR v. Lewelling*, 156 Or App 7, 14, 964 P2d 1104 (1998) ("Statutes that purport to conflict should be read in a manner that will harmonize their import in the absence of persuasive indication that the legislature meant the later-enacted statute to prevail over an unrepealed statute.").

First, it is beyond dispute that ORS 274.400 to 274.412 was enacted to establish procedures by which the board is to determine whether a waterway is title navigable for the purpose of asserting the state's existing ownership rights in its bed and banks.[30] It is also undisputed that (1) navigability for that purpose is determined based on the waterway at the time of statehood; (2) if a waterway is determined to be navigable, the state gains title to lands in the waterway that were "submerged or submersible" at that time; (3) waterways change course over time; and (4) avulsive changes to a waterway's course do not affect ownership boundaries. Thus, when it granted the board jurisdiction to assert title to "submerged or submersible lands in navigable waterways," ORS 274.402(1), the legislature would have understood that the state's claim of ownership with respect to a navigable waterway that had undergone avulsive changes since statehood would, necessarily, include what is presently dry land—that is, land that *now* would be considered "*formerly* submerged or submersible" (emphasis added), but that was "submerged or submersible" at statehood. There was no need for the legislature to specify

---

[30] Nothing in the legislative history of HB 2697 (1995), enacting ORS 274.400 to 274.412, indicates that the legislature considered the relationship between those statutes and ORS 274.960 to 274.985, which were enacted in 1973.

that; indeed, it would have been illogical for the legislature to do so—again, because navigability is determined *as of the time of statehood.* Petitioners' contrary view—that, because the legislature did not specifically include the words "formerly submerged and submersible" lands in ORS 274.400 to 274.412, and it did not amend or repeal ORS 274.960 to 274.985, "[t]he state was and is required to follow separate sets of statutory requirements for the assertion of title to navigable waterways, on the one hand, and to formerly submerged and submersible lands on the other"—is consequently unsound.

Moreover, the text, considered in context and in light of the legislative history of ORS 274.960 to 274.985, leans toward the state's view that those statutes were "intended to apply to lands that had originally been part of waterways already determined to be navigable." ORS 274.963(1) states the legislature's express findings and declarations regarding its enactment of ORS 274.960 to 274.985:

"(a)   Uncertainty exists as to the nature and extent of the state's interest in land formerly submerged or submersible lands [*sic*] within the bed and banks of navigable bodies of water in this state.

"(b)   Such uncertainty causes conflicts in the use and ownership of such land, endangers the rights and titles of landowners and restricts the development of the economic, scenic and recreational potential of such lands.

"(c)   Although the State Land Board and the Department of State Lands are authorized by law to negotiate settlements with respect to the ownership of such lands, action by the State of Oregon to determine and assert its interests, if any, in such lands is necessary for a prompt and orderly resolution of such uncertainty."

ORS 274.963(2) then provides:

"The Legislative Assembly finds[,] therefore, that it is in the public interest to direct the State Land Board and the Department of State Lands to *continue the study of the Willamette River and to conduct studies of the lands formerly submerged or submersible within other navigable bodies of water in this state and, at the conclusion of each such*

> *study, to resolve conflicting ownership claims between the state and private owners by asserting interests remaining or vested in the state in such lands."*

(Emphasis added.) From that expression of the legislature's intentions, it is certainly conceivable that the legislation was directed to land formerly underlying waterways, like the Willamette River, that were already understood to be navigable and as to which conflicting claims of ownership had arisen.

The sparse legislative history provided by the state also supports that view.[31] *See* Minutes, Senate Committee on Judiciary, SB 36, Feb 28, 1973 (statement of Sen Tony Meeker) (explaining that SB 36 was recommended by the Advisory Committee to the State Land Board, which was created for the primary purpose of dealing with conflicts of ownership of the abandoned channels of the Willamette River, and it establishes procedures for settling those conflicts by a specified date); *see also* Advisory Committee to the State Land Board, *Second Biennial Report, Oregon's Submerged and Submersible Lands* 2 (1972) ("Senate Bill 36 relates to the primary mission of resolving conflicting claims between the state and riparian land holders over the issue of ownership of abandoned beds of navigable waters." (Underscoring omitted; capitalization altered.)); House Joint Resolution 40 (1969) (creating Advisory Committee to the State Land Board and requiring report to the legislature).

Although petitioners are correct that the text does not specifically limit the statutes' reach in that way, given the history and context, it is likely that the legislature's references to "navigable bodies of water" in ORS 274.960 to 274.985 meant waterways that had already been determined to be navigable, or indisputably were navigable, not those disputed waterways that had yet to be declared navigable in the first instance. At the least, that is more likely than the alternative view—*viz.*, that the 1973 legislation was intended to forever (after the specified deadlines) prohibit the state from claiming title to dry land as part of a

---

[31] Petitioners do not proffer any legislative history; nor do they address the history offered by the state.

navigability determination, even as to waterways for which a navigability determination had never been made.

## III.  CONCLUSION

In sum, we affirm the circuit court's ruling that the board's declaration of navigability of the 89-mile study segment of the Rogue River, dated June 10, 2008, must be set aside in its entirety on the ground that it failed to satisfy the requirements of ORS 274.408(1)(a). However, we reverse the court's ruling that the board's determination that the river was navigable from RM 100 to 157.5 did not comply with federal law and is not supported by substantial evidence. We also reverse the court's ruling that the declaration violated Oregon law in claiming dry land. Accordingly, we reverse in part and remand. Because our reversal of the general judgment affects the grounds on which the circuit court awarded attorney fees to petitioners in its supplemental judgment, we vacate the supplemental judgment and remand for reconsideration of the award.

General judgment reversed in part and remanded; supplemental judgment vacated and remanded.